# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Belknap*, **2013 IL App (3d) 110833**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL BELKNAP, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-11-0833 |
| Filed | November 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where defendant's convictions for first degree murder and a related offense were reversed and the cause was remanded for a new trial due to the trial court's violation of Supreme Court Rule 431(b) and defendant was found guilty of first degree murder a second time, the second conviction was also reversed and remanded for a new trial due to a violation of Rule 431(b), notwithstanding the fact that the trial judge at the second trial covered all of the *Zehr* principles with each panel of prospective jurors and that, prior to *Wilmington*, no error would have been found; *Wilmington*, however, mandates a specific question as to whether the prospective jurors understood the principles, and the failure of the judge in the second trial to ask that question was an error for purposes of the plain-error doctrine. |
| Decision Under Review | Appeal from the Circuit Court of McDonough County, No. 07-CF-251; the Hon. Gregory K. McClintock, Judge, presiding. |
| Judgment | Reversed and remanded. |

| | |
|---|---|
| Counsel on Appeal | Andrew J. Boyd (argued), of State Appellate Defender's Office, of Ottawa, for appellant. |
| | Gary F. Gnidovec (argued), of State's Attorneys Appellate Prosecutor's Office, of Ottawa, and Edwin A. Parkinson, of State's Attorneys Appellate Prosecutor's Office, of Springfield, for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion. Justice Lytton concurred in the judgment and opinion. Presiding Justice Wright concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1    After his convictions for first degree murder and a related offense were reversed by this court and remanded for a new trial, defendant, Daniel Belknap, was found guilty again by a jury of first degree murder and was sentenced to 24 years' imprisonment. Defendant appeals his conviction, arguing that: (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt of first degree murder; (2) he was denied a fair trial because of the trial court's failure to strictly comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) in admonishing the potential jurors during voir dire; and (3) he was denied a fair trial because of certain improper remarks made by the prosecutor in opening statement and in closing argument. For the reasons that follow, we agree with defendant's second argument and, therefore, we reverse defendant's conviction and remand this case for a new trial.

¶ 2                                    FACTS

¶ 3    On Sunday, September 10, 2006, at about 1 p.m., five-year-old Silven Yocum was found seizing in her bed at defendant's home, where she and her mother, Erin Yocum, were staying. Silven was rushed to McDonough District Hospital (MDH) in Macomb and then airlifted to St. Francis Hospital (St. Francis) in Peoria. She never regained consciousness and died a week later at St. Francis. An autopsy revealed that Silven had been murdered and that she had died from blunt force trauma to the head. Based upon the time frame established, the only person who could have committed the crime was defendant or Silven's mother.[1]

_____

[1]A third person, Silven's uncle, was with Silven for a very brief period during that time frame, but the State and defendant both agree that the uncle either could not have, or did not, commit the crime.

¶ 4　　In December 2007, more than 15 months after the crime was committed, defendant was charged with Silven's murder. He was later found guilty by a jury in McDonough County of first degree murder and endangering the life of a child in connection with Silven's death and was sentenced to concurrent terms of imprisonment of 30 years and 10 years. We reversed defendant's convictions on appeal, finding that the evidence in the case was closely balanced and that as a matter of first-prong plain error, defendant was denied a fair trial when the trial court failed to comply with Supreme Court Rule 431(b) in admonishing potential jurors. *People v. Belknap*, 396 Ill. App. 3d 183, 204-07 (2009) (*Belknap I*). Because we concluded that the evidence presented at the trial was sufficient to prove defendant guilty beyond a reasonable doubt, we remanded the case for a new trial, rather than reversing defendant's conviction outright. *Id.*

¶ 5　　On remand, because of pretrial publicity, the case was transferred to Warren County on motion of defendant. The second jury trial began in August 2011 and lasted about a week. During the beginning of the jury selection process, the trial court informed the entire pool of prospective jurors as to the four principles contained in Rule 431(b)–that defendant was presumed innocent of the charge against him; that the State had to prove defendant guilty beyond a reasonable doubt; that defendant was not required to offer any evidence on his own behalf; and that if defendant chose not to testify, the jury could not hold that against him (see Ill. S. Ct. R. 431(b) (eff. May 1, 2007)). The voir dire was conducted in panels of six prospective jurors and the trial court went through six of those panels before the entire jury and the alternate jurors were selected. With each panel, the trial court admonished the potential jurors as a group as to all four of the Rule 431(b) principles and asked the panel members as a group whether they all agreed with, accepted (or had any difficulty accepting), or had any quarrel with, those principles, varying the language that it used from time to time. At no time, however, did the trial court inquire of any of the panels whether the panel members understood the Rule 431(b) principles. After the jury had been selected and sworn and just prior to opening statements, the trial court provided the jury with some basic instructions. As part of those instructions, the trial court again informed the jury of the four Rule 431(b) principles.

¶ 6　　During its opening statement, the State made certain remarks which defendant claims on appeal constituted an improper attempt by the prosecution to elicit the jury's sympathy for the victim. Those remarks were not objected to by the defense.

¶ 7　　After opening statements had concluded, the State called Larry Leasman as its first witness.[2] Leasman testified that during the early morning hours of Saturday, September 9, 2006, at about 2 a.m., he stopped by defendant's house in rural McDonough County outside of Macomb on his way home from work after he saw defendant's light on. Defendant was working in the garage. Leasman stayed about an hour and smoked methamphetamine (meth) with defendant. After Leasman was there a short period of time, Erin Yocum came into the garage. Erin said that she had been at the Wal-Mart store in Macomb. Leasman did not

---

[2]The testimony has not always been arranged in this opinion in the order it was presented at trial. Some changes have been made in an attempt to make the fact section easier to read.

remember whether Erin had smoked any meth with them and did not see Silven Yocum (Erin's daughter) at all while he was there.

¶ 8      Erin Yocum testified for the State that she was Silven's mother and that she was 36 years old at the time of trial. In February 2006, Erin started dating defendant while she and Silven lived in Macomb. Later that summer, Erin and Silven spent almost every night at defendant's house. During that time period, both Erin and defendant were using meth. When summer was ending and school had started, during what turned out to be the last week of Silven's life, Erin and Silven moved into defendant's house on a more permanent basis and Erin moved Silven's bed and toys to defendant's house. At the time of Silven's death in September 2006, Silven was five years old and was attending kindergarten at a local school.

¶ 9      On Friday, September 8, 2006, Erin and Silven were spending the night at defendant's house. At about midnight, Erin left defendant's house to go to the Wal-Mart and HyVee stores in Macomb to get some magazines. Silven stayed at defendant's house with defendant and was asleep in her bedroom. When Erin returned, defendant was in the garage with Larry Leasman. Defendant and Leasman were smoking meth. Erin did not know Leasman and did not smoke meth with defendant and Leasman in the garage that night. After a short while, Erin went to bed and defendant stayed out in the garage.

¶ 10      Erin woke up at about 6 a.m. Defendant was still out in the garage and Silven was asleep in her bed. Erin went out to the garage and Silven followed her out there a short while later. At some point before 11 a.m., Erin and Silven painted a dog house that was behind the garage. While Erin was painting, Silven sat on Erin's lap and was very clingy that entire day. Erin believed that Silven was getting sick. Defendant asked Silven to come into the house with him and to help him make breakfast. Silven cried and did not want to go with defendant. Defendant took Silven into the house and he and Silven made breakfast, which they all ate. When Erin went into the house after defendant and Silven had made breakfast together, she did not notice anything wrong with Silven, other than Silven was feeling sluggish and tired. Silven was not complaining about any head injuries or holding her head in the back area, and she was not bleeding.

¶ 11      After breakfast, defendant took Silven for a ride on his four wheeler. Later in the day, Silven was not happy and had no one to play with so Erin went to her brother Erik's house to pick up Erik's son, Brett, so that Silven would have someone with whom to play. Brett was a year older than Silven. Silven did not go with Erin to pick up Brett. Rather, because Silven was still not feeling well, Erin had Silven lie down in bed and watch a movie. When Erin returned with Brett about 45 minutes later, Silven was still lying in her bed but was not asleep. Nothing appeared to be wrong with Silven at that time, other than it seemed that Silven was not feeling well. Silven was conscious, was not bleeding, and was not complaining of any head injuries, and Erin did not notice anything unusual. Brett tried to get Silven to play on the trampoline at defendant's house with him, but Silven did not feel like playing. Brett jumped on the trampoline, and Silven sat in a chair that defendant brought to the backyard for her and watched Brett jump.

¶ 12      At some point between 6 p.m. and 7 p.m., Erin's brother, Erik, who was Brett's father, came to defendant's house to pick up Brett and to take Brett to a birthday party at a pizza

place in Macomb. Silven went with Erik to drop off Brett. A short while later, after he had dropped off Brett, Erik returned with Silven. Erik commented that Silven did not seem to have an appetite that night, which was unusual for Silven. Silven was holding onto Erik. Defendant took Silven and put her to bed, and Erik left.

¶ 13    Shortly thereafter, at about 7:30 p.m., Erik called and told Erin that the tire had fallen off of his truck while he was on the way to pick up Brett from the party. Erin left to pick up Erik. At that point, Silven was still awake. Defendant said that he would take Silven, and Erin handed Silven to defendant. When Erin returned with Erik about 20 minutes later, Silven was in bed. Erin never saw Silven awake again after that point. Defendant and Erik went to fix Erik's truck and were able to get it back to defendant's residence. Erik used Erin's car to pick up Brett and took Erin's car with him back to his house for the night. As some point later that night, defendant left the house and went and got medicine and food for Erin and Silven.

¶ 14    The next morning, Sunday, September 9, 2006, Erin woke up at about 6:30 a.m. and again at about 10 or 10:30 a.m. to go to the bathroom and to get a glass of water. At both times, defendant was still in bed sleeping and there was no indication that he had been awake. When Erin walked by Silven's bedroom during those times, she heard what she believed was Silven snoring unusually loud. Erin was not wearing her glasses at the time and did not go into Silven's bedroom to check on her. Erin peeked into the room, heard Silven breathing loud, thought that Silven was getting sick, and decided to let Silven sleep.

¶ 15    During the noon hour, Erik called and asked them if they wanted anything to eat from McDonald's. Silven was still asleep in her bed at the time. Erin went to see what Silven wanted to eat and discovered that Silven was seizing. Erin acknowledged while testifying, however, that she could not remember for sure and that defendant may have been the person who actually discovered that Silven was seizing. Silven did not have epilepsy or any condition like that, and Erin had never seen Silven seize before. The noise that Silven was making was the snoring-like noise that Erin had heard earlier. Erin tried to wake Silven up, but Silven did not wake up or respond. Defendant was in and out of the room during that time, but Erin was not paying attention to him.

¶ 16    Erin called 9-1-1 and an ambulance crew arrived at defendant's house shortly thereafter. Erin acknowledged during her testimony, however, that she may have called her mother before she called 9-1-1. The ambulance took Silven to McDonough District Hospital (MDH) in Macomb. Erin and defendant followed. When Erin and defendant got to MDH, Silven was not awake. While at MDH, Silven's primary care doctor, Dr. Khaled Dabash, told Erin some shocking things about Silven's injuries, most of which were later determined not to be true. The doctor told Erin that Silven was broken from head to toe, that Silven had a broken sternum and punctured bowels, that Silven had been tied at the ankles, and that she had been sodomized.

¶ 17    Silven was later airlifted to St. Francis hospital in Peoria for more intensive care. Defendant and Erin started on their way to the hospital in Peoria in defendant's truck but on the way, defendant decided not go. Defendant pulled over and let Erin out and she was picked up by her parents, who were also on their way to St. Francis. Defendant did not say why he did not want to go to St. Francis. Although Erin could not quite remember, she

guessed that she had told defendant what Dr. Dabash had said while they were on the way to St. Francis. After they arrived at St. Francis, hospital personnel told Erin's family that defendant was not allowed to be there, and Erin's parents took her cell phone away. Although Erin could not remember exactly, she speculated that defendant wanted to come to the hospital, but that her parents and the police did not want defendant there. Despite treatment procedures being administered for brain trauma and to relieve the pressure in Silven's head, Silven remained in a coma and never regained consciousness. Silven passed away at St. Francis on the following Saturday, September 16, 2006.

¶ 18        Erin started using meth when she was dating John Shriver, Silven's father, who was not actively involved in Silven's life. From 2001 through February 2006, Erin dated Andy Yates and continued to use meth throughout that period. Yates was like a father to Silven and had a very close relationship with her. When Erin started dating defendant, Silven had a very difficult time adjusting to being away from Yates and being with defendant. As the start of the school year was approaching, Erin was so concerned about the problem that she talked to school personnel about it and also noted on a teacher questionnaire that Silven was struggling with that issue. After Erin started dating defendant, she tried to let Silven maintain a relationship with Yates and Yates's mother but eventually had to terminate that relationship because Yates was questioning Silven about who Erin was dating and Erin did not want Silven to see her and Yates arguing.

¶ 19        Erin was interviewed by the police on several occasions after Silven's injury and death. Erin told the police that defendant was new to Silven and that Silven was having difficulty adjusting but that the two got along well. It became apparent to Erin very early on after Silven was injured that the police were focusing on defendant. During her police interviews, the detectives made significant attempts to try to make Erin tell them that defendant was the person who had injured Silven. The detectives pleaded with Erin and told her to do it for Silven and herself. At one point, the detectives had Erin come in on Valentine's Day and showed her a tape of defendant's old girlfriend visiting defendant in jail in an attempt to get Erin to tell them that defendant had caused Silven's injuries. In spite of all that, Erin never told the police that defendant killed Silven. During her testimony, portions of Erin's statement to police were played for the jury.

¶ 20        Erin testified further that she did not strike Silven with her hand or an object, did not kick Silven, and did not do anything to Silven that would have caused Silven's head injuries. Erin also stated that she did not witness anything happen to Silven and did not know what had caused Silven's injuries. Erin had given Silven a bath within a couple of days prior to Sunday, September 10, 2006, and did not notice any bruises or scrapes on Silven's body, other than something on the inside of Silven's ankle and a blister on her heel from her new shoes. Erin never heard anything in the middle of the night on Saturday night or Sunday morning–she did not hear Silven crying or screaming or any commotion. Erin was never charged with causing Silven's death. She was, however, charged with, and pled guilty to, misdemeanor child endangerment for having Silven in a place where meth was being used. At some point, Erin was also arrested and charged with a federal crime for her use of meth. On that charge, Erin was allowed to participate in a pretrial diversion program in which she had to complete drug treatment.

¶ 21    Erin continued to be defendant's girlfriend for several months after Silven's death. According to Erin, defendant was very good to Silven and tried very hard to please Silven so that she would warm up to him. Defendant was kind to Silven, took her places, and appeared to love Silven. During the last week of Silven's life, Erin started to get sick and was very sick by that Saturday. Erin became so sick that while Silven was in the hospital, Erin had to go to the emergency room to be treated for a sinus infection. During the entire day of Saturday, September 9, 2006, defendant tried to help out with Silven. Defendant made breakfast with Silven, called some people to try to find someone for Silven to play with, took Silven for a four-wheeler ride, got Silven a chair so that she could watch Brett play on the trampoline, and tried to find things to help Silven occupy her time. Defendant was not mad or angry with Silven, never screamed at Silven, and never spanked her. After defendant was charged in federal court with crimes relating to meth, Erin made numerous trips in the spring and summer of 2007 to the Tazewell County jail, where defendant was being held on those charges, to visit defendant. All of those visits were recorded. Defendant had not been charged with Silven's murder at that point. While defendant was in jail, Erin had hundreds of telephone conversations with defendant, wrote hundreds of letters to defendant, and sent pictures and cards to defendant. In a recorded phone conversation, Erin stated that she felt that the police were unfairly targeting defendant in the death of Silven. Erin had grown very frustrated with the sheriff's office and felt that she was being pressured very hard by the sheriff to say that defendant committed the crime or to say that she knew something that she did not know.

¶ 22    Erin stated that she maintained her relationship with defendant for several months after Silven's death because she loved defendant and because she could not believe that defendant had done anything to Silven since she had never seen any signs that defendant would do anything bad to Silven. During those same months, Erin cooperated with the police as best she could. In a phone conversation that Erin had with defendant in January 2007 when defendant was in jail in which Erin was telling defendant that the sheriff wanted her to come back in for another interview and that she did not want to go, defendant told Erin not to go talk to the sheriff. Erin acknowledged in her testimony that Silven had been uprooted from her home in Macomb to go out and live in a house with defendant and that Silven did not like it. Erin could sense at times that Silven was not fond of defendant. According to Erin, she was in denial all those months when she wrote hundreds of letters and made numerous phone calls to defendant while he was in jail on the drug charges. Defendant was not charged with Silven's murder until a year later.

¶ 23    Erik Yocum, Erin's brother, provided testimony that was similar to Erin's as to the events of September 9 and 10, 2006, regarding his son, Brett, going to defendant's house on September 9 to play with Silven; Silven riding with him to drop Brett off at a birthday party; Silven being very clingy; his truck breaking down later in the evening; him and defendant going back to fix his truck; and his calling and returning to the residence on Sunday, September 10. In further detail, Erik stated that when he was leaving from defendant's residence to pick up Brett from the party and to go back to his own house Saturday night, Silven did not want to stay at defendant's residence and was begging and crying to go home with him. Erik handed Silven to defendant and left the residence to pick up Brett. When Erik

got to the defendant's residence on Sunday, defendant was out on the porch brushing his teeth and motioned Erik to go into the house. Erin was kneeling next to Silven's bed. Shortly thereafter the paramedics arrived. According to Erik, at that time, Erin appeared upset. Defendant showed concern but did not appear to be upset. Although he did not remember initially, after being shown a transcript of his testimony before the grand jury, Erik acknowledged that he testified at that time that he had only seen defendant and Silven together once or twice, but what he had seen was fairly good and that defendant treated Silven like his own child.

¶ 24 Aaron Wilson testified for the State that he was a paramedic through MDH and, as of the trial date, had been a paramedic for over 15 years. Wilson was the first paramedic to arrive at defendant's residence on Sunday, September 10, 2006, in response to the 9-1-1 call. When Wilson arrived on the scene, there were several toys scattered throughout the driveway and defendant was outside removing the toys from the porch. Wilson went into the house with his medical bag to address the emergency, which he had been told was a five-year-old having a seizure. Wilson entered through the kitchen area and went with Erin to the back bedroom where Silven was located. Upon entering the bedroom, Wilson saw that Silven was lying on the bed and was having convulsions and seizures. It did not appear to Wilson to be a standard seizure. Silven's upper extremities were shaking uncontrollably and she would not respond to any stimuli. Silven's eyes were open and fixed to the right, there was nystagmus (uncontrolled shaking of the eyeballs) present, and she had dried blood around her nose and mouth. Wilson began asking Erin, who was crying and very upset, the standard treatment questions. There were six people in Silven's bedroom while Wilson was attending to Silven, including Erin, Wilson, and members of the rescue squad. Wilson eventually scooped Silven up and handed her to members of the rescue squad and told them to take Silven out to the ambulance. Upon arrival at MDH, Wilson turned Silven over to paramedic Heather Connor and to the doctors and nurses at MDH.

¶ 25 According to Wilson, the entire time he was at defendant's residence, defendant never went into Silven's bedroom. Wilson acknowledged, however, that he had no idea whether defendant was in Silven's room before he arrived and that defendant may have stepped into the bedroom while Wilson had his back turned and was attending to Silven. At one point while Wilson was kneeling down attending to Silven, he saw that defendant was pacing back and forth in the kitchen and was saying, "oh, sh***; oh, d***; and God d***." In addition, Wilson stated that at the hospital, there was a time when everyone was looking for defendant. Wilson went outside and found defendant standing in the parking lot by his truck.

¶ 26 Heather Connor testified that she was a paramedic at MDH at the time of Silven's injury and, as of the date of trial, had been a paramedic for 10 years. Connor assisted Wilson when he brought Silven into the hospital that day. Connor met Wilson in the hospital garage with a stretcher and placed Silven in a trauma bay. Connor stayed with Silven the entire time at MDH until she was placed on the helicopter to be airlifted to St. Francis. The only time Connor left Silven was when she went to call for the helicopter. When Silven arrived, she was limp, had no spontaneous movement in any of her extremities, and did not respond to stimuli. Erin, Erin's mother, and defendant were brought into the trauma bay to be with Silven. When Erin learned from the doctor that it was an injury and that Silven's brain was

bleeding, Erin was very distraught and upset and was in a state of shock. Erin stayed by Silven's bedside the entire time and rubbed Silven's hand and stroked her head. Defendant was also in the room but, according to Connor, defendant kept his back to the stretcher and never went over and tried to touch Silven. Conner acknowledged, however, that every person grieved differently and that there was not much that could be read into defendant's demeanor in that regard. Connor told Erin, Erin's mother, and defendant that the helicopter would arrive in 25 minutes and that it would take 20 minutes for the helicopter to get to St. Francis once Silven was aboard. Erin waited for the helicopter, and defendant left to pack a bag for Erin and to get Erin her medicine.

¶ 27    Dr. Khaled Dabash's testimony from defendant's first trial was read to the jury, but was not recorded. Dabash testified during that trial that he was Silven's pediatrician and that he was present in the emergency room on September 10, 2006, when Silven was brought in by ambulance. Upon arrival, Silven was unconscious and was still seizing but did not have a fever or any signs of infection. Silven's body was in contracture, which indicated a central nervous system insult. Dabash observed bruising and marks on Silven's body, which he believed were indicative of abuse, so he ordered a CT scan of her head. The CT scan showed that blood was covering the entire right side of Silven's brain. Dabash also suspected that Silven had a sternal fracture. Dabash ordered a life flight to take Silven to St. Francis in Peoria. Dabash opined that Silven's head injury was caused by blunt force trauma, which had occurred within 24 hours at the least before she was brought into the hospital. Dabash explained that when a child received blunt force trauma to the head, the brain would swell over time until the compression of blood on the brain caused seizures. Dabash felt that Silven's injuries were recent because the swelling in her brain had not yet reached the point of herniation. Herniation was beginning to occur at the hospital, and Dabash gave Silven a drug to reduce the swelling of her brain.

¶ 28    Dr. Julian Lin's testimony from defendant's first trial was read to the jury but not recorded. Lin testified at that trial that at the time of Silven's injury, he was a pediatric neurosurgeon at St. Francis Children's Hospital in Peoria, Illinois. On September 10, 2006, after 5 p.m., Lin examined Silven at St. Francis. Silven was in a coma, and Lin performed surgery to remove a very large blood clot on the surface of the right hemisphere of Silven's brain. Although Lin was able to successfully remove the clot, Silven remained in a coma. A CAT scan revealed that her brain had swelled and that the efforts to control the swelling were unsuccessful. Over the next week, Silven did not improve. She eventually had no brain activity and passed away on September 16, 2006.

¶ 29    Dr. Bryan Mitchell's testimony from defendant's first trial was read to the jury but not recorded. Mitchell testified during that trial that he was a forensic pathologist and that he conducted an autopsy on Silven on September 18, 2006. During the autopsy, Mitchell observed bruises on the right side of Silven's head, abrasions on the back of her head, a bruise on her right shoulder, and bruises and abrasions on her right foot. An internal investigation revealed that underneath the abrasions on Silven's head, there was a bruise inside Silven's scalp that extended to her occipital bone. Mitchell also observed that blood had collected under a membrane on the right side of Silven's brain and that the brain was very swollen. Mitchell opined that the injuries were the result of blunt force trauma and

would not likely be caused by falling off a trampoline or by falling down once. According to Mitchell, there were five distinct areas of blunt force trauma to Silven's head. The blows could have been delivered by a human hand, or possibly by a foot. Some of the symptoms of brain injury were lethargy, loss of appetite, and loss of interest in activities. Mitchell explained that a brain injury, such as the one experienced by Silven, would not necessarily result in the immediate display of symptoms, such as unconsciousness. Mitchell opined that Silven sustained the blunt force trauma 12 to 24 hours before she began having seizures and that Silven died as a result of complications of closed-head injuries due to blunt force trauma caused by blows delivered directly to her head or by blows to the head followed by her striking another object.

¶ 30        Dr. Larry Blum testified for the State as an expert in forensic pathology. Blum was asked by authorities in McDonough County to review the case. After reviewing the reports, photographs, and the findings of Dr. Mitchell, Blum concluded that Silven died of a closed-head injury due to multiple blunt force trauma. According to Blum, severe blunt force trauma to the head may cause bleeding within the skull and swelling of the brain. In Blum's opinion, Silven received three separate severe blows to her head, which were evidenced by three different circular or oval-shaped contusions. The injuries were about an inch to an inch-and-a-half wide and could have all been caused by the same impacting force or object. All three of the blows to Silven's head contributed to her death and were nonaccidental in nature. The injuries could have been caused by a hand, fist, or foot, by either of the two bottles that were located in Silven's bedroom (discussed in later testimony), by a broom handle, or by any number of other household items. Blum stated that some of the symptoms that a person who had suffered blunt force trauma to the head could experience would include a loss of consciousness, loss of appetite, vomiting, headache, listlessness, sleepiness, seizure, and an inability to wake up. Blum explained that the loss of consciousness from such an injury could take several hours to occur because it would take time for the brain to bleed and swell, and as the brain did so, the symptoms the person was exhibiting would become progressively worse until the person began to seize and lose consciousness. Blum opined that it was reasonable to believe that the blunt force trauma occurred between 12 and 24 hours before the seizures and convulsions.

¶ 31        Silven's teacher, the teacher's aide, a program assistant, and the school nurse all testified that Silven was attending kindergarten in September 2006, that she appeared to be a normal five-year-old girl, and that there was nothing about her that caused them any alarm as to her medical or physical condition during the week leading up to her death.

¶ 32        Michael Skelton testified that he worked for the city of Macomb and knew defendant from work. On Monday, September 11, 2006, during the morning hours, Skelton was working when he saw defendant walking west near the fire department and sheriff complex building. Skelton stopped his vehicle and asked defendant what was happening. Defendant responded that he needed to talk to "them" about some "sh***." Skelton assumed that the "them" defendant was referring to was the sheriff's department. Defendant asked Skelton how to get into that place. Skelton drove defendant around to the front door. When Skelton drove off, defendant was still standing outside of the building and Skelton had no idea whether defendant went inside.

-10-

¶ 33    Matthew Hocker testified that he was defendant's cousin, that he had known defendant all of his life, and that he and defendant had grown up together. On Sunday night, September 10, 2006, defendant came to Hocker's residence. Defendant was crying, was visibly upset and worried, and was shaking. Defendant told Hocker that Silven was hurt and had been life-flighted to Peoria and expressed concern about not being allowed to go to the hospital. In Hocker's presence, defendant wondered out loud if he should be worried about whether the police would be waking him up the next day. Defendant never stated, however, that he had hurt Silven. Hocker testified further that he had seen defendant around Silven in the past and that defendant was "[j]ust fine" around her.

¶ 34    Jill Kepple (formerly Jill Goodpasture) testified that she was a friend of Erin and defendant. During the evening of Sunday, September 10, 2006, defendant came to her house. Defendant was nervous, pacing, upset, and restless. Defendant appeared to be concerned about the situation in general and asked Kepple if she thought someone would call the police. Kepple had no idea what defendant was talking about. Defendant told Kepple that he did not know what could have happened to Silven. According to Kepple, although she never saw defendant and Silven personally interacting, whenever she did see the two together, defendant did not mistreat Silven or cause any harm to her.

¶ 35    Joseph Burgess testified for the State that he was currently an inmate in the Department of Corrections (DOC) at the Hill Correctional Center and was serving an eight-year sentence at 85% for aggravated arson. For about four months from about April 2007 to about July 2007, Burgess shared a two-person jail cell with defendant at the Tazewell County jail. Burgess was being held at the Tazewell County jail at that time on multiple charges, including aggravated arson, residential arson, arson, residential burglary, and burglary. In the summer of 2007, he and defendant became friends and they occasionally made jailhouse alcohol together in their cell. Burgess and defendant were eventually caught making jailhouse alcohol and were disciplined.

¶ 36    During the end of June or first part of July, Burgess and defendant were having a conversation in their cell. Burgess mentioned that his birthday was July 28 and was talking about the things that he used to do with his family. Defendant mentioned in response that it would be Silven's birthday if she were still alive. Burgess asked defendant what happened. Defendant became very emotional, started pacing the floor, and looked very distraught. Defendant told Burgess that Silven walked in on him using meth and told him that if he did not stop, she was going to tell on him. Defendant slapped Silven, went berserk, and killed Silven. Defendant stated that he had been up for about two weeks on meth and that his condition might have triggered his reaction. A few weeks later, defendant and Burgess were in the day room with a couple of other inmates and were talking about family-related issues when defendant mentioned the death of Silven. Defendant stated to the other inmates that Silven died after she hit her head on the trampoline and then looked at Burgess and winked.

¶ 37    Burgess stated that he was disturbed by what defendant had told him and was uncomfortable being in the same cell with defendant or being around defendant after that point but acknowledged that he never told jail administrators that he was afraid of defendant or that he wanted to be transferred. Burgess also acknowledged that even after defendant's confession to him, it was still widely known in the jail that defendant and Burgess were very

-11-

close friends and that they were almost inseparable. According to Burgess, as time went by, the story about what happened to Silven grew on him and he did not want it to eat away at him if he did not come forward even though he knew the truth. Burgess stated that he had nephews and nieces at that age and that he thought that telling someone was the right thing to do.

¶ 38 Burgess was interviewed in January 2008 and told police in a videotaped statement what defendant had allegedly told him. At no point after that time did the police come back to Burgess and try to clarify any of the information that turned out to be inaccurate or incorrect. Burgess stated that he talked to his attorney before talking to the police and that he did so to get the burden off of his chest and not because he was looking to gain a benefit as to his potential sentence in Tazewell County. Prior to Burgess coming forward with the information, the prosecutor had made a plea offer to Burgess of 22 years in DOC. After Burgess assisted the authorities in this case, he pled guilty to aggravated arson for an eight-year sentence in DOC to be served at 85%, and the other charges were dismissed.

¶ 39 Jeffrey Ahlers testified for the State that he was an inmate in the DOC at the Centralia facility and was serving a sentence for forgery. Ahlers was in custody at the Tazewell County jail from about August 15, 2007, to about October 15, 2007, while awaiting trial on some charges. While at the jail, Ahlers was housed in the same unit as defendant and became acquainted with defendant through Alcoholics Anonymous (AA) meetings, which were held in the library at the jail once a week. Ahlers had prior problems with cocaine abuse and also had a past history of using meth. At the AA meetings, the attendees would talk about religion and about the hurt that they had caused their families while they were under the influence. Ahlers told defendant that when using meth, he would stay up for 7 to 10 days in a row while driving a truck to California and back, and that after a certain point of being up on meth like that, he would become very paranoid and almost schizophrenic. Defendant told Ahlers that he had been on many binges and had "tweaked" many times while on meth. Ahlers explained that "tweaked" meant that a person using meth had been up for an extended period of time. Ahlers stated that when a person tweaked, he or she might become very paranoid, start grinding his or her teeth, or start doing things that he or she would not regularly do.

¶ 40 After one of the AA meetings, Ahlers and defendant had a conversation about religion and the Ten Commandments while out in the unit. Ahlers and defendant were talking about going to heaven and about how a person would not go to heaven if he killed someone. Defendant broke down and told Ahlers that a D.A.R.E. officer had come to the school or was going to come to the school and that Silven had said something to the D.A.R.E. officer or that he was afraid that she would and that she came home and said something to him that irritated him because he was tweaking and had been up for a very long time, so defendant hit Silven in the head and lost control. Defendant realized that he had hurt Silven very badly and that he had killed her. Ahlers stated that defendant told him that his girlfriend was present when the incident occurred and was in the corner freaking out. According to Ahlers, he and defendant were in the day room of the unit at the time and defendant was sobbing but not crying.

¶ 41 Ahlers went to the authorities on December 24, 2007, and told them he had some information about the case. Ahlers was interviewed by the sheriff on December 26, 2007,

-12-

and, in a recorded interview, told the sheriff what defendant had told him. The entire interview lasted between 10 and 20 minutes. According to Ahlers, a few days before Christmas, he started to think that it was not right, that there was a little girl that was never going to have another Christmas and a family that did not know what had happened to her, and that somebody had to stand up and let it be known what had happened. The sheriff was the person who had transferred Ahlers from Tazewell County jail to McDonough County jail on October 11, 2007, so that Ahlers's criminal charges in McDonough County could be addressed. Ahlers was in McDonough County jail from October 11, 2007, until some time after January, February, or March 2008. Prior to December 26, the sheriff had asked Ahlers if he knew anything about the matter because the sheriff knew that Ahlers had been in Tazewell County jail with defendant, but Ahlers denied that he knew anything about the case. According to Ahlers, he never asked for anything in return for the information he provided and he ended up getting more time in McDonough County than in any other county. Ahlers stated that at no time did anyone from the sheriff's office ever come back to him and try to clarify any discrepancies or inaccuracies in his statement. Ahlers made his statement to the sheriff a few days after another inmate, Nathan Wallick, had come into Ahlers's unit. Wallick had been interviewed by the sheriff regarding this case. Ahlers denied, however, that he ever asked Wallick or another inmate named Nathan Ralph any details about defendant's case. Ahlers also stated that when he made his statement to the sheriff, he had no idea that defendant had been indicted for Silven's murder just a week before. According to Ahlers, it was Christmas and he was clearing his conscience.

¶ 42    Ahlers stated that he had been a religious man all his life, but acknowledged that he had been in the DOC about five times, all for crimes of dishonesty. During cross-examination, the defense played a detailed PowerPoint presentation of Ahlers's extensive criminal history. The presentation showed that Ahlers had been convicted numerous times in several different Illinois counties of various felony crimes of dishonesty, including forgery, retail theft, an offense involving electronic funds, deceptive practices, and theft, and that he had been sentenced to the DOC multiple times both before and after he gave his statement to police in the instant case.

¶ 43    The redacted testimony of defendant from the first trial was read to the jury but not recorded. In his redacted testimony, defendant stated that he and Erin became boyfriend and girlfriend in April 2006. As spring progressed into summer, Erin and Silven spent more and more nights at defendant's house. Silven started school at the end of August 2006, and Erin and defendant decided at that time that it would be better if Silven had her own bed at defendant's house, so they moved Silven's bed, a television, a videotape player, and some toys to defendant's house for Silven. Defendant also set up his trampoline in the yard so that Silven could play on it.

¶ 44    The weekend before Silven's injury was Labor Day weekend, and Silven spent the weekend with Erin's mother. Defendant smoked meth numerous times that weekend and on Monday with Erin and with other people. According to defendant, neither he nor Erin went to sleep at all on Friday night or on Saturday night. On Monday night, he and Erin picked Silven up from Erin's mother's house and brought her home. They again smoked meth on Tuesday when Silven was in school. After school on Wednesday, Scott Kepple and his

girlfriend, Jill Goodpasture, came over to defendant's house and Kepple helped defendant set up Silven's bed. According to defendant, he, Erin, Kepple, and Goodpasture all smoked meth. Neither defendant nor Erin went to sleep on Wednesday night. On Thursday, defendant went for a four-wheeler ride with a friend during the late afternoon or early evening and again smoked meth. Defendant did not know if Erin smoked meth that day. Defendant thought that he and Erin smoked meth again on Friday during the day.

¶ 45    On Friday night, defendant was working outside in the garage from about 8:30 p.m. to about 11 p.m. Erin and Silven were in the house. Some time after 11 p.m., Erin left to go into town. Defendant did not go into the house while Erin was gone. At about midnight, while defendant was in the garage working and Erin was gone, Larry Leasman stopped by. Defendant and Leasman smoked meth. According to defendant, meth made him feel alert and awake and cleared his mind to where he could think and focus better and get a lot of work done. Shortly after midnight, Erin returned home from Wal-Mart. Erin put a few things away in the refrigerator in the garage and then went inside to go to bed. After some time, Leasman left. Defendant was tired and not feeling well, so he lay down on the futon in the garage and went to sleep.

¶ 46    At about 5 a.m. or a little after on Saturday morning, Erin came into the garage and woke defendant up. They were going to smoke meth, but Silven came into the garage. Defendant asked Silven to come into the house with him to make breakfast. Silven wanted to stay with Erin, but Erin told her to go with defendant, so she did. About 10 minutes later, Erin came into the house. Erin was not as tired when she came in and defendant suspected that Erin had smoked meth while she was in the garage and he and Silven were in the house.

¶ 47    After breakfast, they started doing activities outside. Erin and Silven were painting a dog house and defendant was working in the garage. From Friday evening through Saturday morning, Silven had made a few complaints about having a headache, which they assumed was from her new glasses. Other than that, Silven did not complain about any pain to any part of her body or head. Silven did not seem as active as she usually was that morning and was clinging to Erin. Defendant made some calls to some of his friends to try to find someone for Silven to play with but was unsuccessful. Defendant took Silven for a four-wheeler ride. A little while later, Erin had Silven lie down in the house in her bed in the air conditioning and watch a movie because she was not feeling well, and Erin went to pick up Brett. Erin was gone for about 45 minutes to 1 hour. While Erin was gone, defendant finished up what he was working on in the garage and went inside and took a shower. Silven was lying in her bed with her movie on but with her eyes closed.

¶ 48    Erin came home with Brett while defendant was in the shower, and Brett and Silven went outside to jump on the trampoline. After a short while, Silven got off the trampoline and said that she just wanted to watch Brett jump. Defendant brought a chair over by the trampoline for Silven to sit in. Defendant and Erin did not smoke any meth on Saturday, other than Erin possibly smoking meth in the garage in the morning as defendant had mentioned. Some time later in the day, Erik arrived at defendant's house to take Brett to a birthday party. Silven went with Erik to drop off Brett. Erik returned with Silven and they all went into the house and sat in the air conditioning. Silven was getting ready for bed at that time. After Silven got in bed, defendant tucked her in.

¶ 49        Erik left in his truck to pick up Brett. After no time at all, Erik called and stated that the tire had fallen off of his truck about a mile and a half from defendant's house. Erin left to pick up Erik and was gone for about 5 or 10 minutes. While Erin was gone, defendant waited outside and loaded up some tools into his truck so that he could help Erik fix his tire. When Erin and Erik returned, defendant and Erik left to go work on Erik's vehicle. They were gone for about 15 minutes, during which time, as far as defendant knew, Erin stayed outside. When defendant and Erik returned, Erin was standing outside. According to defendant, Erin looked as if she were getting sick. Erik borrowed Erin's car to go pick up Brett, and defendant told Erin to go into the house and lie down.

¶ 50        Erin was a diabetic and had not eaten anything for dinner, so defendant left to go into town to get her and Silven some medicine and to get them all something to eat. Defendant left his house around 8:30 p.m., shortly after Erik left to pick up Brett. While defendant was gone, he made several phone calls to Erin because he could not find the particular type of medicine to get from Erin's house. Erin did not answer the phone. Defendant just grabbed all of the medicines that he could find at Erin's, a tote box of children's movies for Silven, and a tote box of clean clothes for Silven. At about 9:30 p.m., while he was still out, defendant stopped at Taco Bell to get some food for everyone. Defendant got back home at about 10 p.m. When defendant got home, Erin was sleeping on the couch. Silven was sleeping too, and Erin told defendant not to wake Silven up. After they ate, at about 10:30 p.m., defendant and Erin went to bed.

¶ 51        Defendant slept until about 1 p.m. Sunday afternoon when Erin woke him up and stated that Erik was on the phone and wanted to know if they wanted anything to eat from town. Upon being told the time, defendant was surprised that Silven was still sleeping and asked Erin about it. Erin told defendant that Silven had not felt well the previous night and that she let Silven sleep in. Erin stated that she had gotten up at 6 a.m. and at about 9:30 or 10 a.m., and Silven was still sleeping. It did not seem right to defendant that Silven slept that long because it was not like her to sleep that late, but defendant did not think much of it.

¶ 52        Defendant used the bathroom and then checked on Silven. Silven was only half covered up and did not look right to him. As defendant walked closer, he could hear that Silven was making a wheezing-type sound. Defendant could also tell that Silven's eyes did not look right, and he yelled for Erin. Defendant and Erin both tried to wake up Silven, but she would not wake up. When Erik pulled in with Brett, defendant ran outside to get Erik. Defendant told Erik that there was a problem and that Erik needed to get inside. Brett did not know what was going on, so defendant stayed outside with Brett. When the paramedics got there, defendant flagged them down and showed them where to go in the house. Defendant did not go into Silven's room during that time because Brett was really confused and there were several people in Silven's room.

¶ 53        After the ambulance left for MDH with Silven, defendant drove Erin to the hospital. Defendant did not remember much about being at the hospital and did not remember turning his back on Silven in the emergency room. While at the hospital, defendant learned that Silven was having a seizure, that she had sustained some serious head injuries, that she had been subjected to blunt force trauma, and that she had a bleed in her brain. When he and Erin found out that Silven was going to be airlifted to Peoria, defendant left the hospital to get

-15-

some things for Erin so that they could immediately go to the Peoria hospital. As defendant was heading back to MDH, Erin called him and told him that Silven had already been airlifted out, that Erin was with her parents, that he should stop and pick her up at a certain location, and that they would follow each other to St. Francis.

¶ 54    Defendant stopped and picked Erin up as directed. On the way to St. Francis, defendant and Erin were both upset and were wondering what could have happened to Silven. Erin told defendant that the police were at MDH, that they had immediately pointed a finger at defendant, and that they had told Erin that they knew defendant had done this and had questioned Erin hard about what had happened. Erin told defendant further that Dr. Dabash had stated that Silven had been hurt very badly, that she had been tied at the ankles and sodomized, and that every bone in her body was broken. Most of that information turned out to be wrong. Defendant was upset and disturbed by that information and he pulled off the road because he was not driving too well. Erin's parents pulled in behind them, and Erin got out and rode to Peoria with her parents. Erin's mom told defendant to go home and to ride to St. Francis with his mom and dad.

¶ 55    Defendant went back to his house but could not get a hold of his mom and dad, so he went to the house of Scott Kepple and Jill Goodpasture because he had gotten a call from Erin's mom telling him that they did not want him to come to St Francis. Defendant wanted to know if Kepple and Goodpasture would try to find out why he was not wanted at the hospital. Defendant stayed there for probably a half an hour. Defendant testified that he could have made a statement while there about whether Kepple and Goodpasture thought that someone was going to call the police. Defendant made that statement because of the phone call from Erin's mom and because he felt that Erin's mom was insinuating that he was somehow accountable for Silven's injury. Defendant also went to Matt Hocker's house and may have made a similar statement there about whether he had to worry about the police knocking on his door, although he did not remember saying anything like that.

¶ 56    After Silven's injury and death, it seemed to defendant that every time he left the house, he was getting pulled over by the police for something. The police would run a drug dog around his vehicle and tell him that the dog alerted and then would search his vehicle, but would not find anything. One of the police officers gave defendant a business card and told defendant that if he ever wanted to get out of the meth circle and stop doing drugs, to give the officer a call. Eventually in December 2006, defendant called the officer and told him that he wanted to come in and talk. Defendant told the officer everything about his involvement with meth. About a month later, defendant was charged with a federal drug offense. He was taken into custody and placed in Tazewell County jail, which housed some federal prisoners. Defendant subsequently pled guilty to the offense and received a sentence of 44 months in federal prison.

¶ 57    While he was in Tazewell County jail, defendant met Jeff Ahlers. Defendant and Ahlers were in the same unit at the jail and they both attended AA meetings in the jail. Defendant probably attended three or four AA meetings that Ahlers was at as well. Defendant and Ahlers were never cellmates and they never became friends. Defendant never talked to Ahlers about his family and never had any conversations with Ahlers about Silven. According to defendant, he never told Ahlers that he hit Silven, that Silven had told a

D.A.R.E. officer about his and Erin's drug use, or that he lost it and went into a rage while Erin was in the corner watching. According to defendant if an inmate was ever out in the unit crying or sobbing, it would draw attention from the officers. Defendant described a situation where an inmate was crying because he was locked up and the officers removed the inmate and put him in special housing because they thought he might be suicidal. Defendant denied that he ever talked to Ahlers while in the unit, other than just in passing, or that he ever sobbed during a conversation with Ahlers.

¶ 58        Defendant admitted that he was cellmates with Burgess at the Tazewell County jail and that they became friends. Defendant denied, however, that he and Burgess ever made jailhouse alcohol in their cell and stated that there were daily cell searches. Defendant stated further that Burgess had learned from another inmate how to make jailhouse alcohol and was accumulating and storing items to do so in their cell. Burgess was eventually caught with the items and disciplined. Defendant was disciplined as well, even though Burgess admitted that defendant did not have anything to do with it, because defendant knew what Burgess was doing. Defendant acknowledged that he did, at times, have conversations with Burgess about Erin and Silven. Defendant stated that those conversations would usually occur when defendant got letters from Erin with pictures in them and Burgess would ask to see the pictures. Defendant also acknowledged that he told Burgess when Silven's birthday was after he got a picture in the mail from Erin of Silven sitting on defendant's porch with a birthday cake. At no time, however, did defendant tell Burgess that Silven was going to tell on him or that he slapped Silven and that things got carried away. There was also no conversation where defendant was telling some other inmate about the trampoline and winked at Burgess.

¶ 59        Defendant stated that his attorney in his federal case had told him that under absolutely no circumstances was he to discuss any details of his federal case or any other cases pending with anyone in the jail, not cellmates or correctional officers, no one. The attorney told defendant that jails were full of snitches and people looking to better their position in their cases by giving false testimony and told defendant not to mention anything. According to defendant, he followed his attorney's advice. Defendant stated that he loved Erin and Silven and that he did not do anything to cause any of Silven's injuries. Defendant stated further that Silven never said anything to indicate that she knew that defendant and Erin were using drugs. Defendant did not think that Silven even knew what drugs were. Defendant also stated that Silven never made any reference to him regarding a D.A.R.E. officer and that she never threatened to tell on defendant to anyone.

¶ 60        During his testimony, defendant had referenced Silven's injuries as an "accident." On cross-examination, the prosecutor showed defendant pictures of Silven in the hospital and of her injuries and asked defendant if that looked like an accident. Defendant stated that he did not know what happened to Silven. Defendant denied that he caused Silven's injuries but acknowledged that neither Erik nor Erin caused Silven's injuries. Defendant admitted that he told Erin not to talk to the police anymore and to change her cell phone number but stated that he did so because Erin was complaining that the police were harassing her and that it was upsetting her. Defendant denied that he ever told Burgess about Silven's death or that Silven had died. According to defendant, Burgess knew about Silven's birthday because defendant told him and knew about the trampoline because he saw it in one of the pictures

-17-

defendant had received from Erin. Defendant did not dispute the findings of the forensic pathologists–that Silven died from blunt force trauma and that she had been struck multiple times–but denied that he was the person who struck Silven. Defendant also stated, however, that Erin did not strike Silven and acknowledged that he and Erin were the only ones who were around Silven for the whole weekend, except for the short time when she went with Erik to drop off Brett.

¶ 61    After the State rested, the defense first presented the affidavit of Burgess's attorney in the Tazewell County case. The affidavit was read to the jury without objection from the State. In the affidavit, Burgess's attorney stated that in June 2008, Burgess agreed in the Tazewell County case to be tried on the aggravated arson charge by way of a stipulated bench trial and the remaining charges were dismissed. No agreement was made as to sentencing and no limitations were imposed on the sentencing options available to the court. After Burgess was found guilty, his attorney contacted the State's Attorney of McDonough County, James Hoyle, and requested that Hoyle write a letter regarding Burgess's cooperation in the prosecution of defendant in the instant case. Hoyle did so and that letter was presented to the court in the Tazewell County case for consideration in sentencing. Following a sentencing hearing, the trial court initially sentenced Burgess to 12 years in the DOC. However, upon reconsideration, the trial court reduced Burgess's sentence to eight years in the DOC.

¶ 62    Candice Simmons testified for the defense that she was Erin's cousin and that on one occasion in September 2005, she was at Roger Stout's house and she heard Erin, who was also present, state to Stout that if her child ever told on her she would "f***ing kill her." Simmons conceded, however, that she did not think Erin would kill Silven.

¶ 63    Mark Godar testified for the defense that he was a correctional officer at the Tazewell County jail. According to Godar, cells at the jail were inspected on a daily basis and searched thoroughly for contraband once a week. On August 1, 2007, after searching Burgess's cell, officers found nine containers of juice, some bread items in a torn sock, a cleaning bottle, sugar, and candy.

¶ 64    Richard Johnston testified for the defense that he worked for the Tazewell County sheriff's department at the Tazewell County jail. Johnston was the sergeant at the jail who conducted Burgess's disciplinary hearing after certain items of contraband were found in Burgess's cell. Burgess told Johnston at the hearing that he was going to use the items to try to make jailhouse alcohol. Burgess stated that he was the one who collected the items but admitted to Johnston that defendant also knew about the plan. As far as Johnston knew, no one had ever successfully made jailhouse alcohol at the new jail facility.

¶ 65    Chris Butcher testified for the defense that he was a sergeant with the Macomb police department and that in September 2006, he was the school resource officer. As part of his responsibilities, Butcher taught the fifth grade D.A.R.E. program at Macomb schools. Butcher did not recall whether he had gone into the kindergarten classroom in the first several weeks after school started in August or September 2006 but did remember that he did not teach the D.A.R.E. program to the kindergarten. Butcher acknowledged, however, that when he went to the school, he wore his uniform and that at the start of the school year, he would try to visit all of the classrooms.

¶ 66    Jami Hocker (formerly Jami Dysert) testified for the defense that she was a friend of Erin and that she knew Erin, defendant, and Silven. On Saturday, September 9, 2006, Erin called her to see if Silven could come to Hocker's house and play with Hocker's children. Erin seemed agitated and frustrated that Hocker was not able to have Silven over to play that day. During her testimony, however, Hocker also stated that Erin was a good mother.

¶ 67    Rick VanBrooker testified that he became the McDonough County sheriff in December 2006, while the investigation into Silven's death was still pending. At that point, it seemed to VanBrooker that the investigation had stalled. VanBrooker met with Steve Holt, the lead detective in the investigation. Holt was being assisted by Detective John Carson. Early on in his involvement in the case, VanBrooker made up his mind "fairly quickly" that defendant had killed Silven. At one point, VanBrooker sent a letter to a pathologist in Rockford, Dr. Blum, asking him to take another look at the autopsy and to render an opinion as to the timeline, the type of object used to strike Silven, and any pattern of injuries that existed.

¶ 68    The first time VanBrooker met with Erin was on January 16, 2007. During the interview with Erin, VanBrooker pressed Erin, using various interrogation tactics, including offering to show Erin the autopsy photographs of Silven, to try to get Erin to admit that defendant killed Silven and to find out how much Erin knew about the killing. VanBrooker denied, however, that he ever abused, berated, or threatened Erin during the interview. VanBrooker stated that he was searching for the truth and that he wanted to know if Erin had knowledge of what had happened to Silven. According to VanBrooker, the "theme" of the interview was that defendant had gone into a meth-induced rage and had killed Silven. Despite the interrogation tactics used, Erin never stated that defendant had anything to do with Silven's injuries.

¶ 69    On October 11, 2007, VanBrooker personally transported Ahlers from Tazewell County jail to McDonough County jail. VanBrooker asked Ahlers at that time if he knew anything about Silven's death, and Ahlers responded that he did not. On December 24, 2007, Ahlers contacted one of the jailers and stated that he wanted to talk to somebody about Silven's murder. VanBrooker interviewed Ahlers two days later, on December 26, 2007. Before videotaping Ahlers's statement, VanBrooker conducted a "raw interview" of Ahlers. VanBrooker denied, however, that he walked Ahlers through his story or that he suggested a version of events to Ahlers to use as his statement. VanBrooker stated that he did a "raw interview" first because in his experience, people acted and talked differently than they normally would after the camera was turned on. Despite later learning of inconsistencies in Ahlers's statement, VanBrooker did not go back and reinterview Ahlers or confront Ahlers with those inconsistencies. In addition, although Ahlers's statement implied that Erin was in the room when the beating occurred, VanBrooker did not confront Erin with that information.

¶ 70    McDonough County State's Attorney James Hoyle testified that the charge against defendant in this case was amended and made more specific after information was provided by Burgess and Ahlers as to how Silven was killed. At some point during the investigation, police searched defendant's residence, where the injuries occurred. A search warrant was not needed because defendant consented to the search. In around July 2008, Hoyle wrote a letter on Burgess's behalf to the trial judge in Tazewell County, where Burgess had charges

pending. The purpose of the letter was to inform the court in sentencing that Burgess had cooperated in the prosecution of defendant. Hoyle was later informed by Burgess's attorney that the letter he sent on Burgess's behalf was quite beneficial and was later told by the sentencing judge in Burgess's case that the letter was very significant. According to Hoyle, he did not offer Burgess a deal on any charges in McDonough County. Burgess gave his statement to the police without any input from Hoyle, and Burgess asked for nothing in return.

¶ 71　　　John Carson testified that he was a deputy sheriff with the McDonough County sheriff's department. Carson was the crime scene investigator in the instant case. During the afternoon of September 10, 2006, Carson was dispatched to MDH. Upon arrival, he spoke to Dr. Nabash and another medical professional. They informed Carson that Silven had traumatic head injuries and other suspicious bruising, that the injuries were nonaccidental, and that Silven had been abused. In addition to the injuries mentioned, Silven had an injury with a pattern to it on her back, which appeared to have possibly been caused by a shoe, as if Silven had been kicked in the back. The pattern was also found on the back of Silven's shirt. The Department of Children and Family Services (DCFS) was contacted and it implemented a protective safety plan for Silven at the hospital.

¶ 72　　　On September 12, 2006, Carson went to defendant's residence, where Silven had been found, to search for and collect any possible evidence. Defendant consented to the search. A second search was conducted on September 14, 2006, again with defendant's consent. On both occasions, Carson took photographs of various aspects of the scene where Silven was found and of defendant's residence. Carson also collected Silven's bedding, a bottle of massage oil (lotion bottle) located in the closet in Silven's bedroom, and Silven's clothes from the hospital, among other things. A bottle of possibly cranberry juice (juice bottle) was located on Silven's bedroom floor but was not collected. Carson stated that the bottle did not appear to have evidentiary value but acknowledged later in his testimony that from the photographs, it did not appear that anyone had looked at or had picked up the bottle or had inspected it for the presence of DNA or other possible evidence. The bottle of lotion was later disposed of by police because it did not appear to have any evidentiary value and was leaking. Photographs were also taken of several pairs of shoes that were found in the house, and Silven's shirt with the scuff mark on it was sent to the crime lab. The crime lab found that the scuff mark had a pattern to it and wanted to see shoe exemplars so that it could make a comparison. No shoes were sent to the crime lab, however, because Carson did not take any of the shoes into evidence. In Carson's opinion, none of the shoes at the scene appeared to match the pattern on Silven's back. According to Carson, no fingerprints were taken at the scene and nothing was sent to the crime lab for DNA testing. In addition, although the injuries to the back of Silven's head were severe and there were many of them, Carson did not photograph or examine defendant's hands or knuckles to determine if they were bruised or swollen.

¶ 73　　　Ronald Vose testified that he was a licensed private investigator and had previously been a Springfield police officer for 27 years. Vose was retained by the defense to assist them in preparing the case for trial. As part of his work on the case, about six months prior to trial, Vose took several photographs at defendant's residence and took video footage of the inside

and outside of the residence. A copy of the photographs and the video footage was put on disc and was admitted into evidence without objection as an exhibit at trial. In March 2011, Vose took video footage under normal highway conditions of the route that was taken by Erin to pick up Erik after Erik's truck had broken down. That footage had been shown earlier in the trial. The video footage was admitted into evidence without objection as an exhibit, as was a diagram that Vose had made of the inside of defendant's residence. In addition to taking photographs and video and making a diagram, Vose attempted to replicate the pattern of blows that were delivered to Silven's head. Vose obtained a bottle that was similar to the juice bottle that was located in Silven's bedroom and experimented by striking the bottle against a foam board and some drywall and by driving some nails into a board with the bottle to get an idea as to the type of marks the bottle would make and the amount of force that could be generated with the bottle. The foam board and the drywall that Vose had struck with the bottle were admitted into evidence as an exhibit without objection. Vose acknowledged during his testimony, however, that he was not in any way suggesting that he had any evidence to show that a bottle of that type was used to inflict Silven's head wounds and that he was not an expert in the density of a five-year-old girl's skull.

¶ 74 Tessa Pfafman testified for the defense that during the summer of 2006, her daughter was a friend of Silven. On one occasion in June 2006, Silven spent the night at Pfafman's house. When Erin came to pick up Silven the next day, Silven did not want to leave, so Pfafman said that Silven could stay over and spend the night again. Pfafman did not hear from Erin the following day, and Silven stayed at Pfafman's residence for two days after that (although Pfafman estimated that Silven was there a total of three days). Pfafman thought the whole thing was a little unusual, and she was surprised that she did not hear from Erin. Pfafman did not have Erin's phone number and had no way to contact Erin. Pfafman's partner found Erin at Heritage Days and asked Erin to pick up Silven. Pfafman was a college professor and had to teach that afternoon, so her friend, Gretchen Weiss, picked up Silven and Pfafman's daughter and took them to the local pool.

¶ 75 Gretchen Weiss testified that she was a friend of Pfafman and that they both had daughters who were around the same age. On one occasion in June 2006, Weiss was supposed to take Pfafman's daughter to the local pool in Macomb with her own daughters. When Weiss went to Pfafman's house that day to pick up Pfafman's daughter, Silven was there. Weiss did not know Silven or Erin, but because of the situation, took Silven to the pool with them. According to Weiss, the children all played together and had a great time at the pool. After a couple of hours, they decided to get a snack at the pool snack bar, which was close to the entrance. They were sitting at a table in that area when Silven started to cry. Weiss did not know initially why Silven was crying but then saw that Erin was standing at the entrance, presumably to take Silven home. Weiss was struck by the fact that Silven started crying when she saw Erin, even though she had not seen Erin for about three days. To Weiss, it did not seem to be a typical interaction between a parent and a child as Silven did not say that she missed Erin, and Erin did not say that she was sorry for being gone so long. Erin seemed to be very agitated and upset and told Silven to hurry up because she had to go to work. Silven was crying and saying that she did not want to leave, although Weiss acknowledged that it could have just been because she was having fun at the pool. At one

point, while Silven was attempting to gather up her things, she grabbed the wrong things, and Erin told her to get the right stuff or that she was never going to see her friends again. Weiss did not have a good feeling about the entire situation but felt that she had no legal right to keep Silven with her at the pool. After Weiss learned that Silven had been killed, she reported the encounter to the police.

¶ 76    Forensic pathologist Dr. John Ralstan testified as an expert witness for the defense. Ralstan had reviewed the original autopsy report of Dr. Mitchell, the transcript of Mitchell's testimony, the transcript of Dr. Blum's testimony, autopsy photographs, and Silven's CT scan results. From his review, Ralstan agreed with Dr. Mitchell and Dr. Blum that Silven died from nonaccidental blunt force trauma to the head and that the injuries were inflicted within 12 to 24 hours of Silven's hospitalization. Ralstan stated that the autopsy photographs showed multiple bruises on the right and left sides of the back of Silven's head. The blows to Silven's head were severe and caused deep tissue damage to Silven's brain. According to Ralstan, there were three distinct injuries on the back of Silven's head and possibly a fourth injury on the back of her neck. The injuries were round to oval in shape and about an inch to an inch and a half in diameter. Ralstan's best estimate was that the injuries were inflicted with a blunt object with possibly a round face. All of the injuries were close in size and could have been inflicted by the same type of object. It did not appear to Ralstan that the object that was used to inflict the injuries had any sharp edges. According to Ralstan although it was possible for a hand or knuckle to cause a round-shaped injury, such as the ones suffered by Silven, it was not likely, based upon the separate nature and the size of the impacts in this case. Ralstan commented that a person's knuckles would generally leave two or three smaller circular wounds in a row, not the separate large round impacts that were visible on the back of Silven's head. Ralstan opined that any household object of sizeable heft had enough mass to cause Silven's injuries, such as a coffee cup, a drink bottle, a dowel rod, the end of a broom, or a bottle like the juice bottle used by Vose in his experiments or the lotion bottle, both of which had round edges and had caps that were of the appropriate diameter. Ralstan could not state with certainty, however, that the injuries were caused by a bottle, only that the injuries were caused by a medium-sized cylindrical object. According to Ralstan, either a man or a woman could have inflicted the type of injuries that Silven suffered. Ralstan opined that if the bottle used by the defense was able to make impressions in a section of drywall, it could leave a similar impression on a child's head. Although Ralstan noticed the abrasion on Silven's back, he did not focus on that because it was not a cause of Silven's death. Ralstan prepared a report of his conclusions, which was admitted into evidence as an exhibit at trial without objection.

¶ 77    After the defense rested and prior to closing arguments, the trial court gave the jury partial instructions on the law that would apply in this case. As part of those instructions, the jury was again informed as to first three Rule 431(b) principles. The jury was not informed of the fourth principle regarding defendant's right not to testify because defendant's redacted testimony from the prior trial had been presented to the jury during the evidence phase of the trial. In its closing argument, the State again made certain remarks which defendant claims on appeal constituted an improper attempt by the prosecution to elicit the jury's sympathy for the victim. Those remarks were not objected to at trial by the defense. After closing

arguments had concluded, the trial court gave the jury the remaining jury instructions. Following deliberations, the jury found defendant guilty of first degree murder. The defendant was subsequently sentenced to 24 years' imprisonment. Defendant filed a posttrial motion for judgment of acquittal or, alternatively, for new trial. In the motion, defendant asserted primarily that he had not been proven guilty beyond a reasonable doubt. Defendant did not raise any issue in his motion regarding the Rule 431(b) admonishments or about the remarks of the prosecutor of which defendant complains in this appeal. Defendant's posttrial motion was apparently denied, although there is no indication of the trial court's ruling on the motion in the record. Defendant was subsequently sentenced to 24 years' imprisonment for first degree murder. This appeal followed.

¶ 78                                    ANALYSIS

¶ 79    On appeal, defendant argues first that the evidence was insufficient to prove him guilty beyond a reasonable doubt of first degree murder. Defendant asserts that the evidence was lacking in that: (1) there were no eyewitnesses to the crime; (2) there was no physical evidence directly linking defendant to the crime; (3) the strongest evidence against defendant was the testimony of two jailhouse informants regarding inculpatory statements allegedly made by defendant, testimony that defendant asserts was not worthy of belief; (4) the victim's mother had an equal opportunity and motive to commit the crime and was also addicted to drugs; (5) defendant had a good relationship with the victim and had no reason to harm the victim; and (6) defendant's reactions to the victim's injuries and the other circumstances presented did not constitute indications of defendant's guilt of the crime. Based upon this alleged lack of credible evidence, defendant asks that we reverse his conviction outright.

¶ 80    The State argues that the evidence presented at trial was sufficient to prove defendant guilty and that defendant's conviction should be affirmed. The State asserts that the alleged deficiencies in the evidence were argued to the jury at trial, that the jury found defendant guilty, and that defendant is asking this court to reweigh the evidence on appeal and to substitute its judgment for that of the jury as to the credibility of the witnesses and the weight to be given to the evidence, something this court clearly cannot do.

¶ 81    Pursuant to the *Collins* standard (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)), a reviewing court faced with a challenge to the sufficiency of the evidence must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). The reviewing court will not retry the defendant. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact, not the reviewing court. See *Jimerson*, 127 Ill. 2d at 43. Thus, the *Collins* standard of review gives " 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Jackson*, 232 Ill. 2d at 281 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This same standard of review is applied by the

reviewing court regardless of whether the evidence is direct or circumstantial, or whether defendant received a bench or a jury trial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *Jackson*, 232 Ill. 2d at 281; *People v. Kotlarz*, 193 Ill. 2d 272, 298 (2000). In applying the *Collins* standard of review, a reviewing court will not reverse a conviction unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt of the defendant's guilt. *Jackson*, 232 Ill. 2d at 281; *People v. Flowers*, 306 Ill. App. 3d 259, 266 (1999).

¶ 82    Having reviewed the evidence in the present case and applying the *Collins* standard, we find that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of first degree murder. The only issue at the trial in this case was whether the defendant was the person who had beaten the victim and had caused her death. There was no dispute that the five-year-old victim had been murdered and that defendant or Erin were the only two people who could have committed the crime. To establish that defendant was the killer, the State presented the testimony of two jailhouse informants, Burgess and Ahlers, both of whom had spent time in the Tazewell County jail with defendant after the murder was committed. Both witnesses testified that defendant confessed to them that while he was in a meth-induced rage and fearful that the victim was going to tell on him for using drugs, he lost control and killed the victim. Although the two witnesses had never been together in the Tazewell County jail, their statements as to how defendant killed the victim were strikingly similar. It was for the jury, which was fully aware of the possible problems with the informants' testimony, to determine if that testimony was worthy of belief. See *Jimerson*, 127 Ill. 2d at 43; *People v. Fields*, 135 Ill. 2d 18, 47-49 (1990).

¶ 83    In addition to the testimony of Burgess and Ahlers, the State presented numerous pieces of circumstantial evidence to establish that defendant was the killer. In the light most favorable to the State (see *Jackson*, 232 Ill. 2d at 280), that evidence showed that defendant had the opportunity to kill the victim, that he had been abusing meth all week leading up to the victim's death, that he had not been sleeping or had been sleeping erratically, and that at varying times he had acted in a manner or made statements that were indicative of guilt–when the paramedics were present at the house, when he was at MDH, when he initially decided not to go to St. Francis, when he was walking to the sheriff's station to be interviewed after the injury occurred, when he was with his friends and his cousin after the injury occurred, and when he spoke to Erin on the phone while he was in jail. It was for the jury to determine whether the circumstantial evidence was indicative of defendant's guilt and the amount of weight to give to that evidence. See *Jimerson*, 127 Ill. 2d at 43; *Jackson*, 232 Ill. 2d at 281. Under the *Collins* standard, all of that evidence, along with the statements of Burgess and Ahlers, left no reasonable doubt as to defendant's guilt and was sufficient to prove defendant guilty. See *Jackson*, 232 Ill. 2d at 281; *Flowers*, 306 Ill. App. 3d at 266. Therefore, we reject defendant's argument on this issue.

¶ 84    As his second argument on appeal, defendant argues that he was denied a fair trial when the trial court failed to strictly comply with Supreme Court Rule 431(b) while admonishing potential jurors during voir dire. Specifically, defendant asserts that at no time did the trial court inquire of the potential jurors whether they understood the four Rule 431(b) principles. Defendant acknowledges that this issue has not been properly preserved for appellate review

since he did not object to the alleged error during voir dire and did not raise the issue in his posttrial motion (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Allen*, 222 Ill. 2d 340, 350 (2006) (an error is not preserved for appellate review unless the defendant objects at trial and includes the error in a written posttrial motion)) but asserts, nevertheless, that we should reach the merits of this issue as a matter of first-prong plain error because, according to defendant, the evidence in this case was closely balanced. Based upon the application of the plain-error doctrine, defendant asks that we reverse his conviction and that we remand this case for a new trial.

¶ 85      The State argues that the plain-error rule does not apply in this case and that defendant's forfeiture of this issue, therefore, must be honored. In support of that argument, the State asserts first that no error occurred during voir dire because the trial court's questioning of the potential jurors as to whether they agreed or accepted the four Rule 431(b) principles implied that the jurors also understood the principles and was sufficient to satisfy the requirements of Rule 431(b). Second, the State asserts that even if this court finds that the trial court erred by failing to specifically ask the potential jurors whether they understood the four Rule 431(b) principles, the plain-error rule would still not apply because the evidence in this case was not closely balanced in that defendant convicted himself by excluding both Erin and Erik as the perpetrator. Finally, as a third alternative, the State asserts that even if an error occurred and the evidence was closely balanced, the application of the plain-error doctrine would not be warranted in this case because it cannot be shown that the particular error in question, alone, tipped the scales of justice against defendant.

¶ 86      Defendant responds to the State's argument by asserting in reply that: (1) the recent Illinois Supreme Court case of *People v. Wilmington*, 2013 IL 112938, which was also cited in defendant's initial brief on appeal, requires that potential jurors be asked both whether they understand and whether they accept the four Rule 431(b) principles; (2) this court previously found in the last appeal based upon similar evidence that the evidence in this case was closely balanced; and (3) under the first prong of the plain-error doctrine, defendant was only required to show that plain error occurred and that the evidence was closely balanced and was not required to show anything else.

¶ 87      The plain-error doctrine is a very limited and narrow exception to the forfeiture or procedural default rule that allows a reviewing court to consider unpreserved error if either one of the following two circumstances is present: (1) a clear or obvious error occurred and the evidence in the case was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) a clear or obvious error occurred and the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Walker*, 232 Ill. 2d 113, 124 (2009); *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Herron*, 215 Ill. 2d 167, 177-87 (2005); Ill. S. Ct. R. 615(a). Under either prong of the plain-error doctrine, the burden of persuasion is on the defendant. *Walker*, 232 Ill. 2d at 124. If the defendant fails to satisfy that burden, the procedural default of the issue must be honored. *Id.* The first step in any plain-error analysis is to determine whether an error occurred. *Id.* at 124-25. To do so, a reviewing court must conduct a substantive review of the issue. *Id.* at 125.

¶ 88    The supreme court rules are obligations that the court and the parties are required to follow and are not merely suggestions to be followed by the court and parties if it is convenient to do so. *Belknap I*, 396 Ill App. 3d at 205. The determination of whether a supreme court rule has been violated and the consequences that should apply if it has been are questions that are reviewed *de novo* by the appellate court. See *Wilmington*, 2013 IL 112938, ¶ 26.

¶ 89    The version of Supreme Court Rule 431(b) that was in effect when defendant was tried provided:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

Under Rule 431(b), a specific question and response process is mandated. *Wilmington*, 2013 IL 112938, ¶ 32; *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). The trial court is required to ask each potential juror whether he or she understands and accepts each of the principles set forth in Rule 431(b). *Id.* "The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Id.* "[T]he trial court's failure to ask jurors if they [understand] the four Rule 431(b) principles is error in and of itself." (Emphasis omitted.) *Wilmington*, 2013 IL 112938, ¶ 32.

¶ 90    In the instant case, based upon the supreme court's recent decision in *Wilmington*, we must conclude that error occurred during the voir dire in defendant's trial. See *id.* There is no dispute in this case that the trial court at no time asked any of the potential jurors whether they understood the four Rule 431(b) principles. Other than failing to so inquire, the trial court was very thorough in its Rule 431(b) admonishments and covered all four principles with each panel of prospective jurors during voir dire and at other times throughout the trial. Under those circumstances, prior to the *Wilmington* court's decision, we would have found that no error occurred, as had at least one other district of the appellate court. See *People v. Blankenship*, 406 Ill. App. 3d 578, 581-83 (2010) (juror's response that he or she accepts or agrees with Rule 431(b) principles implies that juror understands principles and is sufficient to comply with the requirements of Rule 431(b)). In our opinion, however, the *Wilmington* court's decision compels a different result, and we must now conclude that the failure to specifically ask jurors whether they both understand and accept the Rule 431(b) principles constitutes error. See *Wilmington*, 2013 IL 112938, ¶ 32; *Thompson*, 238 Ill. 2d at 607; *People v. Curry*, 2013 IL App (4th) 120724, ¶¶ 64-65 (the trial court's failure to give the

potential jurors an opportunity to respond to the court's question as to whether the jurors understood the four Rule 431(b) principles constituted error even though the court later asked potential jurors whether they agreed or disagreed with the four principles and gave the potential jurors an opportunity to respond to that question). Thus, we find that the trial court's failure to specifically inquire whether potential jurors understood the four Rule 431(b) principles during voir dire in the present case constituted error for purposes of the plain-error doctrine. See *id.*

¶ 91 Having concluded that error occurred, we must determine whether the evidence was closely balanced, as defendant suggests, so as to warrant the application of the plain-error doctrine and to relieve defendant of the forfeiture of this issue. The determination of whether the evidence is closely balanced is a different determination than whether the evidence was sufficient to prove defendant guilty beyond a reasonable doubt, and finding that the evidence was sufficient to prove defendant guilty does not preclude a determination that the evidence was closely balanced. See *Belknap I*, 396 Ill App. 3d at 206. Based upon our thorough review of the evidence presented at trial in the instant case, we find that the evidence was, in fact, closely balanced. As defendant points out, there were no eyewitnesses who saw defendant commit the crime and no physical evidence to directly link defendant to the crime. The strongest evidence that the State presented was the testimony of the two jailhouse informants regarding defendant's alleged confession to them. As we pointed out in the last trial in this case, although such testimony may ultimately be found to be credible by the trier of fact and may form the basis of a guilty verdict, it must be treated with caution. *Id*. In addition, the remaining circumstantial evidence presented could have either been viewed as indicative of defendant's guilt or explained innocently away depending on the view of that evidence taken by the jury. Under those circumstances, we find that the evidence was closely balanced.

¶ 92 Because we have determined that plain error occurred and that the evidence was closely balanced, we reverse defendant's conviction for first degree murder and remand this case for a new trial. Contrary to the State's alternative assertion on appeal, as of yet, there is no *de minimus* exception to the first prong of the plain-error rule, and defendant in this case is not required to show any additional prejudice.[3] See *id.* at 207. Rather, under the first prong of the plain-error doctrine, unpreserved error is considered when the evidence is closely balanced, regardless of the seriousness of the error. *Id.* We understand the hardship that requiring yet another trial in this case will undoubtedly cause to those who are involved in

_____

[3]Arguably, there is some indication in the more recent decisions of our supreme court that it may be starting to view the first prong of plain-error as more than just a determination of whether an error occurred and whether the evidence was closely balanced. See *People v. White*, 2011 IL 109689, ¶¶ 133-34, 139-44, 148; *People v. Adams*, 2012 IL 111168, ¶¶ 22-23. These rulings may indicate that a more contextual approach is warranted under the first prong of plain error and that it should be determined based upon the totality of the circumstances whether the particular error in question actually or likely tipped the scales of justice against the defendant. However, without more of a definitive statement from the supreme court in that regard, we will adhere to its prior established precedent on this issue as set forth in *People v. Herron*. See *People v. Vesey*, 2011 IL App (3d) 090570, ¶¶ 18-20.

or affected by this case. However, we believe that such a result is required under the law.

¶ 93    Having determined that defendant's conviction must be reversed and the case remanded for a new trial, we need not consider defendant's third argument on appeal–that he was denied a fair trial because of certain improper remarks made by the State in opening statement and in closing argument. We trust that both sides will carefully scrutinize their planned opening statements and closing arguments prior to the next trial.

¶ 94                                    CONCLUSION

¶ 95    For the foregoing reasons, we reverse defendant's conviction for first degree murder and remand this case for a new trial.

¶ 96    Reversed and remanded.

¶ 97    PRESIDING JUSTICE WRIGHT, concurring in part and dissenting in part.

¶ 98    I agree with the majority that the State's evidence was sufficient to convict defendant of first degree murder. However, I respectfully disagree that the trial court's inexplicable failure to strictly comply with Supreme Court Rule 431(b) for a second time constituted plain error once again.

¶ 99    I write separately because I respectfully disagree with the majority's conclusion that the evidence presented during this second jury trial was closely balanced on the issue of identity. I acknowledge the majority's holding is entirely consistent with the outcome of the first appeal in this case, which required our review of very similar evidence presented to the first jury. However, I respectfully submit a different conclusion is required with respect to whether the evidence against the defendant was truly closely balanced with respect to the identity of the perpetrator due to additional guidance provided by our supreme court since the date of mandate in the first appeal in *People v. Belknap*, 396 Ill. App. 3d 183 (2009), issued by our court on November 18, 2009.

¶ 100    For example, in *People v. White*, 2011 IL 109689, Justice Karmeier observed that when a defendant seeks review of an otherwise forfeited error by relying on the closely balanced prong of plain error, a reviewing court's preliminary step should be to first evaluate "the totality of the evidence" in the case, as a practical matter. *White*, 2011 IL 109689, ¶ 139. In *White*, the court conducted a qualitative "commonsense assessment" of the totality of evidence presented, rather than a quantitative approach, and ultimately concluded the evidence in that case was not closely balanced. *White*, 2011 IL 109689, ¶ 139.

¶ 101    Later, in *People v. Adams*, 2012 IL 111168, ¶ 22, Justice Burke relied on *White* and reiterated, once again, that when "determining whether the closely balanced prong has been met, we must make a 'commonsense assessment' of the evidence (*People v. White*, 2011 IL 109689, ¶ 139) within the context of the circumstances of the individual case."

¶ 102    Here, the record shows the State introduced *undisputed* medical evidence, gathered during the child's autopsy, revealing she suffered multiple blunt force blows to her head, with a round object. The medical expert concluded the child's seizures resulted from recent

-28-

swelling of her brain due to these three blows, and therefore, the child's injuries occurred within 12 to 24 hours before she arrived at the emergency room.

¶ 103    Erin's uncontested testimony established only Erin, Erik, and defendant spent time with the little girl within the 12 to 24 hours immediately preceding her seizures. Erin's testimony indicated that beginning on September 9, 2006, her daughter did not have any energy and was unusually clingy. The next day, September 10, 2006, the child began suffering a cascade of seizures in her bed as discovered at 1:30 that afternoon. Silven ultimately slipped into a coma and died, days later, on September 16, 2006.

¶ 104    As the State points out, the defense theory excluded both Erin and Erik as the perpetrators and suggested reasonable doubt existed because the child may have caused her own fatal injuries by falling off a trampoline. However, no witness supported the far-fetched theory that the child was responsible for her own significant injuries resulting from a single speculative fall from a trampoline.

¶ 105    First, defendant did not see the child fall from a trampoline. Second, Erin testified that although Silven was near a trampoline on September 9, 2006, Silven did not show an interest in or attempt to jump on the apparatus that day because she was not feeling well. Third, the medical expert opined, due to the number and locations of the child's injuries, that *multiple* blunt force traumas resulted in Silven's death. In other words, the physical evidence did not support a single-fall defense. Finally, I observe that the evidence could not be closely balanced unless there was some evidence supporting the theory that the child caused her own injuries by playing and then falling from a trampoline 12 to 24 hours before her seizures began.

¶ 106    Therefore, I respectfully suggest based on the recently clarified totality of the evidence approach to be employed by this court, the case at bar should not be viewed as closely balanced with respect to the identity of the child's murderer, in light of defendant's own statements excluding Eric and Erin as suspects.

¶ 107    I emphasize that every trial is unique. However, in a majority of trials, such as the one in the case at bar, the evidence is neither overwhelming nor closely balanced and falls somewhere in between these two extremes. I disagree with the implied premise that any trial without overwhelming evidence of guilt must be automatically categorized as a closely balanced case upon review. In fact, under *White* and *Adams*, our supreme court urges us to look at the *totality* of the evidence on *both* sides when measuring whether a particular case falls somewhere in between the two ends of the spectrum between overwhelming proof and closely balanced evidence. Here, there is no plausible evidence that the child caused her own injuries, thereby excluding the defendant as the perpetrator beyond a reasonable doubt.

¶ 108    Next, I turn to the controversial testimony of the jailhouse informants. I agree their testimony should be reviewed with a healthy dose of skepticism. Yet, it is entirely possible the jurors rejected this testimony as incredible. Assuming the jury did not believe defendant spoke to either informant about the incident, the fact remains defendant testified that neither Erin nor Erik caused the injuries that caused the child to suffer, and then die. Perhaps, just perhaps, the jury circumstantially inferred defendant could only be certain of Erin's and Erik's innocence due to his personal, but unspoken, knowledge of his role in the child's

death. Without viewing the jailhouse informants' testimony worthy of consideration and based on the recently clarified totality of the evidence approach to be employed by this court, I conclude the case at bar should not be viewed as closely balanced with respect to the identity of the child's murderer due to defendant's own testimony.

¶ 109　　While it is discouraging that the trial court *repeated* the Rule 431(b) error following reversal and remand by this court, it is equally troubling for me to recognize the prosecutor and defense counsel *both* stood silent and allowed the court to commit the same error again. In addition, it should not be overlooked that the duplicated Rule 431(b) insufficiency has now been forfeited by the defense for a second time.

¶ 110　　Thus, defense counsel's failure to preserve the issue by objecting to the court's questioning during *voir dire* may represent an effective defense strategy insuring automatic reversal in any truly closely balanced case, unlike the case at bar, but where the court fails to strictly comply with Rule 431(b). Based on the unique circumstances present in this record, I respectfully contend the repeated Rule 431(b) error in this appeal should not become an automatic "get out of jail free" card to be played each time a properly instructed jury convicts this defendant, in the absence of structural error.

¶ 111　　Finally, as suggested by the supreme court, I next consider the unique combination of various contextual "circumstances" present in this record now before our court. First, the Rule 431(b) deficiency during the second trial was completely cured, in my view, by the formal instructions provided by the court set out in pattern criminal jury instructions regarding the constitutional principles omitted from the *voir dire* discussions. Thus, in spite of the preliminary error during *voir dire*, I consider it significant that this defendant does not contend the second jury was less than neutral, predisposed to reject the *Zehr* principles, or failed to follow and then apply the rules of law according to the court's instructions at the close of the evidence. In other words, defendant does not allege structural error resulted in this case. Consequently, I would affirm defendant's conviction.

¶ 112　　For these reasons, I would affirm the conviction in this case.