2015 IL App (3d) 130214

Opinion filed April 27, 2015

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2015

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-13-0214 |
| v. | ) ) | Circuit No. 11-CF-535 |
| MONTANA SEBBY, | ) ) | Honorable Cynthia M. Raccuglia, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justices Holdridge specially concurred, with opinion.
Justice O'Brien dissented, with opinion.

**OPINION**

¶ 1        A La Salle County jury convicted defendant Montana Sebby of resisting a peace officer,

a Class 4 felony (720 ILCS 5/31-1(a-7) (West 2010)).  The trial court sentenced defendant to two

years' imprisonment with one year of mandatory supervised release.

¶ 2        Defendant appeals, claiming: (1) that the trial court committed plain error by failing to

properly ask prospective jurors if they understood and accepted the four *Zehr* (*People v. Zehr*,

103 Ill. 2d 472 (1984)) principles codified by Illinois Supreme Court Rule 431(b) (eff. July 1,

2012); and (2) that he is entitled to a new trial based upon the State's improper comments during

cross-examination and closing arguments on defendant's invocation of his right to terminate police interrogation and his postarrest silence.

¶ 3    We affirm.

¶ 4                                          BACKGROUND

¶ 5    The State charged defendant by information with resisting a peace officer, a Class 4 felony (720 ILCS 5/31-1(a-7) (West 2010)).  The charging information alleged that defendant knowingly resisted Deputy Jason Mohr during the authorized act of arrest when he pulled away from and physically struggled with the deputy, and that defendant's acts were the proximate cause of injury to Mohr.  At defendant's arraignment, he pled not guilty and demanded a jury trial.

¶ 6                                          I. *Voir Dire*

¶ 7    The case proceeded to jury trial on January 28 and 29, 2011.  During *voir dire*, the trial court admonished the jury pool of the four principles of law enumerated in Illinois Supreme Court Rule 431(b) (eff.  July 1, 2012) as follows:

> "The most important law on a criminal case is the defendant
> who you will meet in a moment is presumed innocent.  The
> presumption of innocence exists throughout the trial.  The
> defendant doesn't have to prove anything.  The defendant doesn't
> have to testify.  The defendant doesn't have to present evidence,
> and the defendant, if he does not, and you cannot and you must not
> hold that against him or assume anything by that.  The State is
> obligated by law to prove the defendant guilty beyond a reasonable
> doubt."

¶ 8 The trial court then proceeded to question potential jurors in panels of six. During the questioning of the first panel, the court engaged in the following colloquy with a potential juror regarding bias:

"Q. First of all, you need to understand the presumption of innocence.

A. Understood.

Q. But what if the defendant denies that but you have to understand that may be a story told, and it may be you having to decide whether it's a story told and credibility. I can't say that may not be the story. I may have to say that's what somebody says, but the defendant by the way who's presumed innocent doesn't have to testify, and if he doesn't, you must not hold that against him. Would that affect your decision?

A. Not if there's no evidence pointing to that fact.

Q. Okay. Good. That's what I'm looking for. That was a very good answer because that was the answer in this case. Now, going back to all six of you, the defendant is presumed innocent, and that presumption of innocence exists throughout the trial. The defendant does not have to prove anything. He doesn't have to testify. He doesn't have to present evidence, and if he does not, then you must not hold it against him. It's the State's burden to prove the defendant guilty beyond a reasonable doubt, and I need to go through each of you with that."

3

¶ 9    The trial court then individually asked the remaining members of the panel whether any of them "[h]ad any problems" with the principles of law, while interweaving questions about whether there was anything that would prevent them from being fair and impartial jurors. The trial court specifically repeated its question with respect to the presumption of innocence to two potential jurors because they indicated that they might be biased.

¶ 10    Using much the same phrasing as above, the trial court proceeded to announce the four principles of law to each panel of prospective jurors. The trial court, again, asked the individual jurors of each panel whether they "[h]ad any problems" with those principles, while continuing to interweave questions about whether anything would prevent them from being fair and impartial jurors. The trial court varied the phrasing of the question to "do you believe in those principles of law?"

¶ 11                                              II. Trial

¶ 12    Following opening statements, the State called Deputy Joshua McGrath. McGrath testified that he and the other deputies went to the Sebby family home to serve a court order for custody of a minor child, L.S. Defendant informed the deputies that the child was with her grandmother, Bonnie Sebby, and he did not know how to contact them. McGrath and the other officers handed the custody order to defendant to read. Defendant handed it back to Deputy Mohr, yelled for them to leave, and then poked McGrath in the shoulder with his finger. McGrath advised defendant he was under arrest for battery of a police officer. When McGrath tried to grab defendant's wrist, defendant pulled away; the deputies took him to the ground to get control of him. After the deputies handcuffed defendant, McGrath noticed scratches on Mohr's hand and wrist. The prosecutor inquired of McGrath what he "did" with defendant following the arrest, and if McGrath "attempt[ed] to interview him" at the jail. McGrath responded:

4

"At the jail we did read him his *Miranda* warning and tried to talk to him about what happened. When I asked him why he poked me the way he did he stated that he was just getting ready to tell us we could go in and check the house for [L.S.] and then when I explained to him you were just seconds before yelling at us to leave your property when you reached over and poked me, he did not want to talk any further. He revoked [*sic*] his right to not talk further."

¶ 13 On cross-examination, McGrath did not recall whether he stuck his foot in the door to prevent the woman who first answered the door from closing it. He also testified that he did "not know exactly at what point and time" Mohr's injuries occurred. McGrath could not recall defendant's position on the ground, but stated there was some "rolling around."

¶ 14 Deputy Jason Mohr testified that defendant poked McGrath and resisted both officers when they attempted to arrest him. Mohr and McGrath tried to control defendant by grabbing his arms and taking him to the ground. Mohr had scrapes from the gravel on his hand and wrist. On cross-examination, Mohr denied that he was agitated, used profanities, or threatened to pull defendant's mother from the house by her hair. Mohr admitted that he could not say 100% what caused his scrapes. Mohr also testified that defendant stepped forward off the front step in order to poke McGrath. He admitted that the detail about defendant stepping forward was not written in the incident report, despite the fact that officers are trained to write important details in their reports.

¶ 15 The State called Deputy Jarred Arthur, who testified that defendant was verbally hostile, poked McGrath, and resisted when McGrath attempted to arrest him. McGrath and Mohr took

5

defendant to the ground while Arthur held his feet to prevent him from kicking anyone. After the takedown, defendant was shirtless and mostly on his stomach, although Arthur could not recall his exact position. On cross-examination, Arthur testified that defendant stepped forward to poke McGrath. He also admitted that detail was missing from McGrath's report.

¶ 16    Following the close of the State's case-in-chief, defense counsel unsuccessfully moved for a directed verdict.

¶ 17    The defense first called Angela Dankenbring. Dankenbring testified that she was a family friend who had previously dated defendant's brother, Oakland Sebby. On the morning of the incident, Dankenbring testified that she answered the door and told the deputies that Bonnie Sebby was not home and she was not sure if anyone else was home. When she tried to close the door to put on her shoes, one deputy stuck his foot in the door, yelled at her, and told her he would arrest her for obstructing justice. An argument ensued when officers wanted to search the house and Dankenbring told them she did not have permission to allow them to do so. Defendant then came to the door and shut it behind him while he spoke with the deputies. After putting on a sweatshirt and shoes, Dankenbring returned and allegedly witnessed the following events.

¶ 18    Defendant told the deputies that L.S. was not home. Defendant repeatedly asked them to leave, which made the deputies more agitated and hostile. Defendant talked with his hands until one officer yelled "assault." Dankenbring testified this surprised her, as she did not see anything like an assault occur. Defendant threw his hands up and said, "I'm cool. I'm cool. I'm calm." Two deputies then grabbed defendant's arms and, according to Dankenbring, "played tug of war with him until he was on the ground face down in the gravel." Defendant did not struggle with the deputies, but the deputies "were not clear on who was doing what. Defendant looked like a

6

puppet being held between two people." Mohr and Arthur had defendant on the gravel, but McGrath did not engage in the arrest. On cross-examination, the State asked Dankenbring whether defendant was wrestling with the deputies. She stated that "[t]hey were wrestling his arms trying to get them in position and that made him move."

¶ 19　　　　Defendant's brother, Oakland Sebby, testified that he was in the basement when he heard the confrontation. He went upstairs and watched the incident through the blinds of the French door facing the porch. Oakland testified he heard McGrath shouting profanities. Defendant asked the deputies to leave several times. Oakland did not see defendant step toward or make contact with any of the deputies. McGrath screamed, "Assault [and] that Montana f'ed up and he was going to jail ***." The other two deputies "grabbed each arm and starting playing tug of war with [defendant], walking him away from the house and trying to take him to the ground." Oakland further testified that when McGrath told defendant he was under arrest, he threw his hands up and said, "I'm cool. I'm cool." The officers threw defendant down on the gravel face first. Defendant moved because he was trying to protect himself from the gravel.

¶ 20　　　　Samantha Russell, defendant's girlfriend, testified that she and defendant were downstairs asleep with their daughter when the deputies arrived. Defendant went upstairs when he heard pounding on the door. Five minutes later, Russell awakened her daughter and they went upstairs to check on defendant. At that point, defendant was already in handcuffs. McGrath was standing on the porch and the two other deputies were with defendant. Russell gave a tee-shirt to McGrath to give to defendant, but she found it on the ground after they left. Following defendant's release from jail, Russell took photos of the scratches on his arms and back.

7

¶ 21    Defendant testified on his own behalf, stating that the police had visited the family home twice before due to custody issues with L.S. L.S. was the daughter of his recently deceased sister, and L.S.'s father wanted custody. L.S. seemed depressed so Bonnie Sebby, her grandmother, took her to visit family in the south. On their previous visits to the Sebby residence, defendant stated that the deputies never told him that they had a custody order for L.S. Defendant also stated that he did not live in the Sebby residence, but was there to help his parents feed the animals on the farm while Bonnie was away.

¶ 22    Defendant stated he was shirtless and barefoot when he went upstairs. He saw Dankenbring try to close the door when it sprung open because a deputy stuck his foot in it. Three deputies were on the front porch. When defendant stepped outside, one deputy said, "You're Montana right?" Defendant told them Bonnie and L.S. were not there. The deputy accused him of lying. One of the deputies stated they would "drag [Bonnie] out by her hair." Mohr used profanities and was yelling. Mohr gave defendant the custody order. Defendant thought it was a search warrant, but when he saw that it was not, he handed it back to the deputies.

¶ 23    Defendant testified that throughout the incident, he stood on the step and did not leave it. He asked the deputies to leave multiple times. When the deputies demanded to go into the house, defendant replied that they could not all go in because it was early in the morning and he did not want to wake the household, but maybe one person could go in. As he looked at each one to decide who to let in, the deputies grabbed him, called him a liar, and told him that he "messed up big time." Defendant testified he did not make contact with any of the deputies before they grabbed him nor did he step toward the deputies. They pulled him off the steps and swung him onto the gravel, where he lost his balance.

¶ 24        Defendant stated the officers tugged at him and he landed on his face. They told him to stop resisting. He told them that they had his arms and he could do nothing because he was "face first on the side of [his] head." Defendant scraped his back due to the deputies dragging him around and he was "trying not to get hurt on the gravel." Defendant denied resisting and said that if the officers were trying to arrest him, he would have peacefully complied since he did not do anything to get arrested.

¶ 25                            III. Closing Arguments

¶ 26        During closing arguments, the State argued that defendant knowingly resisted arrest and that his resistance proximately caused Mohr's injuries. The prosecutor stated to the jurors that they were the judges of credibility in the case. The prosecutor noted that each deputy's testimony was consistent, repeatedly referring to the deputies' version of events as the main source of evidence and arguing that the jury should compare the deputies' testimony with that of the defense witnesses to determine defendant's guilt. The prosecutor stated that "[t]he deputies' testimony today is clear, and nothing that was presented from the point of view of the defense witnesses did anything to controvert that."

¶ 27        The prosecutor characterized the deputies' testimony as consistent with each other and with their reports. He noted that none of the defense witnesses, including defendant, made any statements prior to their testimony that day in court. The prosecutor argued that the jury's determination of whether the State proved its case beyond a reasonable doubt depended upon its ability to "decide who's telling the truth and who's not."

¶ 28                                IV. Posttrial

¶ 29        The trial court tendered instructions to the jury. During deliberations, the jury asked one question: "If you tell the police to vacate your property, does this end their authorization or do

9

they have the authority to remain?" With the approval of both parties' attorneys, the trial court sent the following response back to the jury, instructing it to continue with its deliberations: "Ladies and gentlemen, the question you have asked is a legal question. The answers to your legal questions are found in the jury instructions I have given you. Please review these instructions again for your answer. I'm sending this back." The jury returned with a verdict of guilty. At that time, defense counsel moved for a judgment, notwithstanding the verdict, which the trial court denied.

¶ 30        On March 8, 2013, defense counsel argued a motion to set aside the jury verdict or, in the alternative, a new trial, contending that the trial court erred in its response to the jury question. The trial court denied the motion. The matter proceeded to sentencing. Defendant made a statement on his own behalf, after which the court sentenced him to two years' incarceration with one year of mandatory supervised release.

¶ 31        Defendant appeals.

¶ 32                                ANALYSIS

¶ 33                        I. Plain Error and Rule 431(b)

¶ 34        Defendant contends that the trial court committed plain error by failing to comply with Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. July 1, 2012)). Specifically, that the trial court erred in failing to ask prospective jurors whether they understood and accepted the four *Zehr* principles codified in Rule 431(b). Defendant argues that despite failing to object to *voir dire* at trial, we should review this issue under the first prong of the plain-error doctrine, as the evidence is closely balanced.

¶ 35        The plain-error doctrine is a limited and narrow exception to the general rule of procedural default (*People v. Naylor*, 229 Ill. 2d 584, 593 (2008)) and allows a reviewing court to consider unpreserved error when one of two conditions is met:

> " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Walker*, 232 Ill. 2d 113, 124 (2009) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 36        "Under both prongs of the plain-error doctrine, the burden of persuasion remains with defendant." *Id.* (citing *Naylor*, 229 Ill. 2d at 593). The initial step in conducting plain-error analysis is to determine whether error occurred at all. *People v. Hudson*, 228 Ill. 2d 181, 191 (2008). This requires us to conduct a substantive review of the issue. *People v. Johnson*, 208 Ill. 2d 53, 64 (2003).

¶ 37        Defendant argues, and the State concedes, that the trial court's question to the potential jurors whether they had any "problems" with the *Zeh*r principles of law failed to sufficiently comply with the rule and constituted clear error. A review of both *People v. Thompson*, 238 Ill. 2d 598 (2010), and *People v. Wilmington*, 2013 IL 112938, support defendant's contention. In *Thompson*, the trial court admonished the jury of the four Rule 431(b) principles. It then asked each juror whether he or she understood the concepts of proof beyond a reasonable doubt and the

11

presumption of innocence.  *Thompson*, 238 Ill. 2d at 602.  The trial court did not ask the jurors if they agreed with those principles, but only if they would " 'have any problem signing a guilty verdict.' "  *Id.*  Our supreme court held that Rule 431(b) "mandates a specific question and response process" since "[t]he language of Rule 431(b) is clear and unambiguous."  *Id.* at 607.  The trial court " 'shall ask' potential jurors whether they *understand* and *accept* the enumerated principles."  (Emphases added.)  *Id.*  The court concluded that the trial court necessarily violated Rule 431(b) by failing to do so.  *Id.*

¶ 38    The supreme court reaffirmed *Thompson* in *People v. Wilmington*, 2013 IL 112938, ¶ 28, where it found that the trial court only asked whether potential jurors " 'disagree[d] with' " the principles of law.  Again, the trial court's failure to ask jurors if they both understood and accepted the enumerated principles of Rule 431(b) was "error in and of itself."  *Id*. ¶ 32.

¶ 39    Having determined that an error occurred, our analysis hinges upon whether or not the evidence is closely balanced, as this is the only avenue of relief available to defendant under plain-error review.  See *Thompson*, 238 Ill. 2d at 610-11 (expressly finding that Rule 431(b) errors are not structural errors and, therefore, are not *per se* reversible because failure to comply with the rule does not automatically result in a biased jury); see also *People v. Belknap*, 2014 IL 117094, ¶ 47.

¶ 40    The State contends that the evidence was not so closely balanced that the trial court's error warrants reversal under the plain-error doctrine.  We agree.

¶ 41    The State presented persuasive evidence that defendant committed the offense of resisting a peace officer.  Deputies McGrath, Mohr, and Arthur all testified to essentially the same sequence of events.  McGrath knocked on the door of defendant's residence several times before Dankenbring answered.  When McGrath asked to speak to the owner of the residence,

12

Dankenbring responded that no one was home. Defendant then came to the door to speak to the officers. McGrath attempted to explain to defendant why the officers were at the house, and Mohr handed the court order to defendant. Defendant was uncooperative and became more and more agitated. Defendant reached over and poked McGrath in the chest with his finger, at which point McGrath advised defendant he was under arrest for battery of a peace officer. McGrath and Mohr both testified that McGrath attempted to grab defendant's wrist to effectuate the arrest, at which time defendant pulled away and resisted. Mohr assisted McGrath in getting control of defendant. The struggle with the deputies occurred on the gravel driveway.

¶ 42        Defendant argues that the defense witnesses who observed the arrest all testified that defendant made no contact with McGrath, and that the deputies announced the arrest because defendant told them to leave. Defendant cites to *People v. Naylor*, 229 Ill. 2d 584, 608 (2008), for the proposition that the evidence is closely balanced when it involves a credibility contest. While defendant correctly states a holding of *Naylor,* our supreme recently stated that "a reviewing court must undertake a commonsense analysis of all the evidence in context when reviewing a claim under the first prong of the plain error doctrine." *Belknap*, 2014 IL 117094, ¶ 50; see also *People v. Adams*, 2012 IL 111168, ¶ 22; *People v. White*, 2011 IL 109689, ¶ 139 (where defendant claimed the evidence was so closely balanced that it necessitated review of an error, the court held that a qualitative—as opposed to strictly quantitative—commonsense assessment of the evidence demonstrated it was not).

¶ 43        Utilizing that contextual commonsense analysis here, it is apparent that defendant's witnesses are less than credible. This is evidenced by the fact that Dankenbring originally informed officers that no one was home. Yet, only moments later, defendant appeared at the doorway to speak to officers. Both Oakland Sebby and Samantha Russell were also present in

13

the home at the time Dankenbring made that statement, as they testified at trial to details involving defendant's arrest. The State also impeached defendant's credibility with the stipulated statement of Jason Martin, an investigator with the La Salle County sheriff's department. The parties stipulated that if Martin were to testify, he would state that he attempted to serve the custody order on the evening prior to defendant's arrest on October 26. At that time, defendant told Martin that Bonnie Sebby may be out running errands or may be at her attorney's office. A mere 12 hours later, defendant told McGrath and Mohr that Bonnie and L.S. were visiting family down south.

¶ 44 Furthermore, unlike *Naylor*, where neither party presented extrinsic evidence to corroborate or contradict either version, the State points to the photographs of Deputy Mohr's injuries. This photographic evidence, in addition to the deputies' testimony, corroborates their version of events.

¶ 45 Accordingly, we find that defendant failed to show that the evidence was closely balanced thus, the first prong of the plain-error doctrine does not apply.

¶ 46 Putting our ruling aside for a moment, we note that the State requested defendant's appeal be held in abeyance until such time as our supreme court decided *People v. Belknap*, 2014 IL 117094, in hope of an unambiguous plain-error framework in the context of Rule 431(b) violations. As the court filed the *Belknap* opinion on December 18, 2014, we would be remiss not to mention its holding and effect on this case.

¶ 47 Prior to *Belknap*, recent decisions of the supreme court explained that plain-error analysis under the first prong may involve more than just a rigid determination of whether an error occurred and if the evidence was closely balanced. See *People v. White*, 2011 IL 109689,

14

¶¶ 133-34, 139-44; *People v. Adams*, 2012 IL 111168, ¶¶ 22-23. Both *White* and *Adams* state that a qualitative, not quantitative, commonsense assessment of the evidence is needed in determining whether it is actually closely balanced. *White* goes on to posit:

> "Plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced: that the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him, *i.e.*, that the verdict 'may have resulted from the error and not the evidence' properly adduced at trial ***." *White*, 2011 IL 109689, ¶ 133 (quoting *People v. Herron*, 215 Ill. 2d 167, 178 2005)).

¶ 48     Indeed, the parties and many court watchers assumed that the supreme court granted the State's petition for leave to appeal in *Belknap* to address just that: "whether, even if the evidence is closely balanced, reversal is not required unless the error alone likely tipped the scales of justice against defendant." *Belknap*, 2014 IL 117094, ¶ 39. Yet, the court punted on the issue, finding simply that the evidence was not closely balanced. This rendered moot the need to address the State's argument that defendant must further show "that the error itself likely had some impact on the jury's verdict." *Id.* ¶ 62.

¶ 49     In instances where the trial court erred in admonishing the jury as to the *Zehr* principles of Rule 431(b) and the evidence *was* closely balanced, the failure of the court to address the prejudice issue for plain-error review causes more problems than it solves. See Justice Burke's

special concurrence. *Belknap*, 2014 IL 117094, ¶¶ 72-92 (Burke, J., specially concurring, joined by Freeman, J.).

¶ 50    First, the weight of the evidence—either overwhelming, closely balanced or somewhere in between—is irrelevant to the issue of whether or not defendant received a fair and impartial jury through the process of *voir dire*. That is a procedural issue, not an evidentiary one. As Justice Burke points out, a "[t]rial before a biased jury is structural error." *Id.* ¶ 85 (citing *Thompson*, 238 Ill. 2d at 610). "Thus, if a defendant can establish that a question which went unasked during *voir dire* was necessary to ensure a fair jury, then the verdict must be reversed, regardless of whether the evidence at trial was overwhelming, closely balanced or somewhere in between." *Id.* Here, defendant established that the trial court erred in giving Rule 431(b) admonitions. However, the supreme court rejected the argument that failure to ask a Rule 431(b) question amounts to plain error under the second prong in *Thompson*, 238 Ill. 2d at 610-11, and again in *Belknap*, 2014 IL 117094, ¶ 47.

¶ 51    If not structural error, how should we deal with Rule 431(b) violations where such violations have absolutely no bearing on the closeness of the evidence? In my[1] view, not every error is so prejudicial as to tip the scales of justice against defendant or warrant reversal even where the evidence may be closely balanced. Like the majority in *White*, I would liken the situation to an ineffective assistance of counsel claim. *White*, 2011 IL 109689, ¶ 133. If defendant argues for plain-error review under the closely balanced prong, defendant should demonstrate that, but for the error, the outcome of the trial would likely be different. Of course,

---

[1] As can be seen by Justice Holdridge's special concurrence and Justice O'Brien's dissent, the author is alone in the views that follow (*infra* ¶¶ 51-54), which, admittedly, constitute *dicta* of the rankest form.

there are closely balanced cases and there are closely balanced cases. For example, in *Belknap*, the supreme court disagreed with the two-judge majority in the appellate court who found the evidence closely balanced. *Belknap*, 2014 IL 117094, ¶ 56. In a case where the evidence is truly closely balanced, any error that could tip the scales should be enough to cause one to lose faith in the verdict.

¶ 52        A panel of this court commented on whether the particular error in question actually or likely tipped the scales of justice against defendant, but declined to deviate from what it understood to be established precedent without a more definitive statement from the supreme court. *People v. Belknap*, 2013 IL App (3d) 110833, ¶ 92 n.3. Under the appellate court *Belknap* decision, if defendant can show the evidence is closely balanced, reversal is warranted regardless of whether or not the error could have prejudiced his case. *Belknap*, 2013 IL App (3d) 110833, ¶ 92. This not only misstates the holding of *People v. Herron*, 215 Ill. 2d 167, 187 (2005), it also leads to an absurd result in practice. First, *Herron* reiterated the plain-error doctrine, stating that under the first prong "the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him." *Id*. This court's decision in *Belknap* effectively read the necessity of proving prejudicial error out of the doctrine; the supreme court then sidestepped the issue.

¶ 53        This court's decision in *Belknap* would prevent the State from arguing that absent the error, the outcome of the trial would have been the same. This would, in turn, lead defense attorneys to sit silent rather than object in closely balanced cases. It will be easier to obtain a reversal with no trial objections. Despite the supreme court's failure to address the issue in *Belknap*, 2014 IL 117094, it appears that *White* and *Adams* correctly stand for the proposition

17

that a defendant must show the error was prejudicial in addition to showing that the evidence was closely balanced. A Rule 431(b) error is not evidentiary and, therefore, unable to "tip the scales" in a closely balanced case. It would have no bearing on the verdict. See *Belknap*, 2014 IL 117094, ¶¶ 85-87 (Burke, J., specially concurring, joined by Freeman, J.). That is, where no reasonable person could say that the error could have affected the verdict, it makes no sense to reverse simply because there was no objection to the error at trial.

¶ 54   The trouble with Justice Holdridge's view is that, as pointed out above, it puts a premium on defense counsel not objecting at trial. If defense counsel's objection is erroneously overruled, the State can argue harmless error on appeal. Under the *Belknap* view adopted by Justice Holdridge, any error not objected to at trial warrants automatic reversal whenever two of three appellate judges find the evidence closely balanced. This would be so even when no reasonable person could conclude that the error could have affected the verdict. This seems counterintuitive.

¶ 55   II. Defendant's Invocation of His Right to Terminate the Interrogation
and the State's Closing Arguments

¶ 56   Defendant challenges the State's introduction of his postarrest silence as evidence. Specifically, Deputy McGrath's testimony on direct examination that after reading defendant his *Miranda* rights at jail and attempting to discuss the incident with defendant, defendant invoked his right to terminate the interrogation. Defendant also takes issue with the State's closing arguments where he claims the prosecutor improperly sought to discredit defendant's testimony when the prosecutor commented that none of the defense witnesses made statements prior to their testimony at trial. Having failed to object to either issue at trial, defendant, again, requests plain-error review under the first prong.

18

¶ 57    We agree that generally questions and remarks by a prosecutor regarding a defendant's postarrest silence are improper. *People v. Patterson*, 282 Ill. App. 3d 219, 234 (1996). Thus, a defendant's postarrest silence cannot be used to impeach his trial testimony or to otherwise create an inference of guilt. *Doyle v. Ohio*, 426 U.S. 610, 619 (1976); see also *People v. Mischke*, 278 Ill. App. 3d 252, 265 (1995). We disagree, however, with the characterization of McGrath's testimony as an improper comment on defendant's postarrest silence.

¶ 58    *People v. Martinez*, 86 Ill. App. 3d 486 (1980), is directly on point. In *Martinez*, Officer Hanlon testified that he advised defendant of his *Miranda* rights and then asked him a question regarding evidence found at the crime scene. Defendant answered but, as the interview progressed, stated he had talked enough and did not want to talk to Officer Hanlon any longer. Hanlon stated that " '[a]t that time the interview was terminated.' " *Id*. at 488. As is the situation here, Martinez neither objected to this testimony at trial, nor did he raise it as a ground for relief in his posttrial motion. *Id*. at 489. The court found that mentioning the fact that the interview ended at the defendant's request could not be considered an impermissible comment on his silence where defendant had not remained silent but, instead, had chosen to talk to the officer and later end the conversation. *Id*. Without further reference to the termination of the interview during the course of the trial or exploitation by the State, the alleged error did not constitute plain error. *Id*.

¶ 59    We further reject defendant's argument that the prosecutor impermissibly commented on the defendant's postarrest silence as evidence of defendant's guilt during closing argument.

¶ 60    "It is well established that prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant." *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994) (citing *People v. Pittman*, 93 Ill. 2d 169,

19

176 (1982)). "A prosecutor's comments must be considered in the context of the parties' arguments as a whole and their relationship to the evidence." *People v. Hall*, 194 Ill. 2d 305, 350 (2000) (citing *People v. Madej*, 177 Ill. 2d 116, 161 (1997)). "Arguments based on facts or reasonable inferences drawn from the facts are within the scope of proper argument even where they reflect unfavorably on the accused." *People v. Manley,* 222 Ill. App. 3d 896, 907 (1991). Additionally, "the credibility of a witness is a proper focus of closing argument if it is based on the evidence or reasonable inferences drawn from the evidence." *People v. Dresher*, 364 Ill. App. 3d 847, 859 (2006) (citing *People v. Hickey*, 178 Ill. 2d 256, 291 (1997)).

¶ 61       The prosecutor stated, "There are no statements made by any defense witnesses to any law enforcement about what happened that day." When considered in its proper context, we find the complained of remarks were within the bounds of acceptable argument. We further find that, contrary to defendant's assertion, the prosecutor's statement was not a comment on defendant's postarrest silence, and served only to highlight the credibility of the deputies' testimony over that of the defense witnesses. It also called attention to the fact that none of defendant's witnesses had spoken to police or given their account of the incident prior to their testimony at trial. Defendant's contention that the State argued "[defendant] should not be believed since he remained silent" is disingenuous. Such language is conspicuously absent from the record, nor can it be gleaned from what is present.

¶ 62       Even assuming error in this instance, it does not rise to the level of plain error, as the evidence is not closely balanced. We affirm defendant's conviction.

¶ 63                                          CONCLUSION

¶ 64       For the foregoing reasons, the judgment of the circuit court of La Salle County is affirmed.

20

¶ 65 Affirmed.

¶ 66 JUSTICE HOLDRIDGE, specially concurring.

¶ 67 I agree with Justice Schmidt that any errors committed by the trial court or the prosecutor in this case are not reversible under the plain-error doctrine because, under a qualitative, commonsense assessment of the evidence, the evidence was not closely balanced. I write separately because I disagree with an important aspect of Justice Schmidt's plain-error analysis. Relying on our supreme court's decisions in *People v. Herron*, 215 Ill. 2d 167 (2005), *People v. White*, 2011 IL 109689, and *People v. Adams*, 2012 IL 111168, Justice Schmidt concludes that "not every error is so prejudicial as to tip the scales of justice against defendant or warrant reversal even where the evidence may be closely balanced" (*supra* ¶ 51), and that a defendant seeking plain-error review under the closely-balanced-evidence prong "must show the error was prejudicial in addition to showing that the evidence was closely balanced" (*supra* ¶ 53).

¶ 68 I disagree. As an initial matter, I find it unnecessary to reach this issue because we have already found that the evidence in this case was not closely balanced. Normally, I would not respond to *dicta*. However, in this case, I feel compelled to address it because I disagree with Justice Schmidt's statement of the law on this issue and with his characterization of our supreme court's holdings in *Herron*, *White*, and *Adams*. In *Herron*, the supreme court indicated that, where there is error in a closely balanced case, we should "err on the side of fairness so as not to convict an innocent person." *Herron*, 215 Ill. 2d at 193. Once the defendant proves that there was an error and that the evidence was closely balanced, the error is considered prejudicial. *Id.* The *Herron* court explained:

"If the defendant carries the burden of persuasion and convinces a reviewing court that there was error and that the evidence was closely balanced, the case is not cloaked with a presumption of

21

prejudice. The error is actually prejudicial, not presumptively

prejudicial." *Id.*

See also *People v. Piatkowski*, 225 Ill. 2d 551, 564-65, 568, 571-72 (2007); *People v.*

*Belknap*, 2013 IL App (3d) 110833, ¶ 92 n.3, *rev'd on other grounds*, 2014 IL 117094;

*People v. Vesey*, 2011 IL App (3d) 090570, ¶ 18.

¶ 69    In *White*, our supreme court noted that a defendant may obtain reversal of his conviction under the closely-balanced-evidence prong of plain error only if he can show that he was prejudiced by the alleged error. *White*, 2011 IL 109689, ¶ 133. However, "this does not alter the rule established in *Herron*, *i.e.*, that a defendant may show prejudice (and therefore obtain reversal of his conviction) merely by showing that the trial court committed an error and that the evidence was closely balanced." *Vesey*, 2011 IL App (3d) 090570, ¶ 19. In *White*, the supreme court held that the evidence was not closely balanced. *White*, 2011 IL 109689, ¶¶ 134-42. Thus, under the rule set forth in *Herron*, the *White* court reasonably concluded that the defendant had failed to prove that the error alleged by the defendant was prejudicial. "*White* does not upend the established principle that if a defendant shows that there was error and that the evidence was closely balanced *** the error is both prejudicial and reversible and no further showing of actual prejudice is required." *Vesey*, 2011 IL App (3d) 090570, ¶ 19. Thus, although *White* states that a defendant alleging plain error under the closely-balanced-evidence prong must "show he was prejudiced," (*White*, 2011 IL 109689, ¶ 133), a defendant may show such prejudice merely by showing that an error occurred and that the evidence was closely balanced. *Herron*, 215 Ill. 2d at 193; *Vesey*, 2011 IL App (3d) 090570, ¶ 19; *Belknap*, 2013 IL App (3d) 110833, ¶ 92 n.3, *rev'd on other grounds*, 2014 IL 117094.

¶ 70    Admittedly, although *White*'s holding is consistent with the traditional plain-error analysis described above, certain statements in *White* appear to be in tension with that analysis.

22

For example, as Justice Schmidt notes, *White* compares the showing of prejudice required in plain error cases to the showing of prejudice required in cases involving claims of ineffective assistance of counsel based on evidentiary error. *White*, 2011 IL 109689, ¶ 133. In the latter cases, a defendant must show that there was a " 'reasonable probability' " of a different result had the evidence in question been excluded." *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Applying this "result-oriented" analysis (*id.* ¶ 134), the supreme court noted that the alleged error at issue in *White* was not prejudicial because it did not "figure prominently in the [trial] court's finding of guilt." *Id.* ¶ 140; see also *id.* ¶¶ 133, 135. These statements arguably conflict with *Herron*'s rulings that a defendant alleging plain error "need not prove that the error *** actually misled" the fact finder and that a defendant may prove prejudice merely by showing "that there was error and that the evidence was closely balanced." *Herron*, 215 Ill. 2d at 193. However, in *Vesey*, we concluded that these statements in *White* are "*dicta* which are unnecessary to the court's holding." *Vesey*, 2011 IL App (3d) 090570, ¶ 20. As noted above, *White* held that the defendant could not show prejudice because the evidence was not closely balanced. Because *White*'s holding is consistent with the traditional plain-error analysis announced in *Herron*, I do not read *White* as changing that analysis. Our appellate court reached the same conclusion in *Vesey*. *Vesey*, 2011 IL App (3d) 090570, ¶ 20.

¶ 71        Similarly, in my view, *Adams* does not change the traditional plain-error analysis described above. In *Adams*, our supreme court found that the evidence presented was not closely balanced because the defendant's explanation of the events at issue was "highly improbable." *Adams*, 2012 IL 111168, ¶ 22. The court also went on to note that the jury was properly instructed and that the prosecutor's improper comments were "not of a sort likely to inflame the passions of the jury." Although the court referenced these factors in addition to the strength of the evidence in determining whether the defendant could obtain reversal under the closely

23

balanced prong, it did not hold that such factors *must* be considered. In other words, the *Adams* court did not hold that a defendant must independently demonstrate prejudice to obtain plain-error review even if the evidence is closely balanced. Because the evidence in *Adams* was not closely balanced, the court did not need to reach that question. Without a more definitive statement from the supreme court on this issue, we should adhere to the supreme court's prior established precedent as set forth in *Herron*. See *Belknap*, 2013 IL App (3d) 110833, ¶ 92 n.3, *rev'd on other grounds*, 2014 IL 117094.

¶ 72        One further point bears mentioning. Citing Justice Burke's special concurrence in *Belknap*, Justice Schmidt notes that the weight of the evidence is irrelevant to the issue of whether or not defendant received a fair and impartial jury through the process of *voir dire* because a " '[t]rial before a biased jury is a structural error. ' " *Supra* ¶ 50 (quoting *Belknap*, 2014 IL 117094, ¶ 85 (Burke, J., specially concurring, joined by Freeman, J.)). I agree. In my view, a trial court's failure to properly ask prospective jurors whether they understand and accept the four *Zehr* principles codified by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) deprives the defendant of a fair trial and is therefore reversible error under the second prong of the plain-error doctrine. However, as Justice Schmidt notes, our supreme court rejected this argument in *Thompson*, 238 Ill. 2d at 610-11. Thus, unless and until the supreme court overturns *Thompson*, we are forced to analyze these claims under the "closely-balanced-evidence" prong of the plain-error doctrine, as the supreme court itself did in *Belknap*. Although I find this approach to be illogical, we cannot improve the situation by muddying the analysis under the closely-balanced-evidence prong. In my view, a better solution would be for the supreme court

24

to reconsider its holding in *Thompson*, stand by its prior holding in *Zehr*, and enforce Rule 431(b) as it is written.[2]

¶ 73    JUSTICE O'BRIEN, dissenting.

¶ 74    Where, like here, the determination of the defendant's guilt hinges entirely on a determination of the credibility of the witnesses, the evidence is closely balanced and a reversal of the defendant's conviction under the first prong of the plain error doctrine is required as set forth in *People v. Naylor*, 229 Ill. 2d 584, 608 (2008).  Unlike the majority, I think a commonsense assessment of the evidence shows that either version of the events is entirely plausible.  It is just this type of case that warrants reversal under the first prong of the plain error doctrine.  *People v. Naylor*, 229 Ill. 2d 584, 593 (2008) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).  Therefore, I would reverse the conviction of the defendant and remand to the trial court for a new trial.

---

[2]  I am also sympathetic to the point that Justice Schmidt makes in paragraph 54, *supra*.  As Justice Schmidt notes, our supreme court's current approach to analyzing these claims allows the State to argue harmless error when defense counsel objected to the error at trial, but not when counsel failed to raise any objection and the evidence is closely balanced.  I agree that this seems "counterintuitive."  *Supra* ¶ 54.  However, contrary to Justice Schmidt's suggestion, this is not my approach; it is the approach dictated by our supreme court.